61 P.3d 309 (2003)
148 Wash.2d 403
WASHINGTON WATER JET WORKERS ASSOCIATION; Talon Industries, Inc.; Cutting Technology, Inc.; Pacific-Rim Enterprises, Ltd.; Jetpoint Technologies L.L.C.; Specialty Metals Corp.; Definitive Solutions & Technologies, Inc.; and Maxtec, Inc., Appellants,
v.
Howard YARBROUGH, in his official capacity as the Administrator of the Division of Correctional Industries; Washington State Department of Corrections, Division of Correctional Industries; Jet Holdings, Ltd., d/b/a MicroJet; and Kenneth Piel and Sharon Piel, Respondents.
No. 70814-2.
Supreme Court of Washington, En Banc.
Argued January 31, 2002.
Decided January 16, 2003.
*311 Richard Stephens, Bellevue, WA, for Appellants.
Christine Gregoire, Attorney General, Michael Ballnik, Carol Murphy, Asst. Attorneys General, Olympia, WA, Cutler & Nylander, Robert Nylander, Philip Cutler, Seattle, WA, for Respondents.
*310 CHAMBERS, J.
Washington Constitution article II, section 29 provides:
After the first day of January eighteen hundred and ninety the labor of convicts of this state shall not be let out by contract to any person, copartnership, company or corporation, and the legislature shall by law provide for the working of convicts for the benefit of the state.
We must determine whether this language prohibits all private employment of prisoners or whether it only prohibits the now-unused eighteenth and nineteenth century "contract system of labor." Under the contract system, the State leased the involuntary labor of prisoners to private contractors who had near complete control of the prisoners. The system was inhumane, corrupt, and universally condemned. By contrast, the Washington Legislature has created a system where prisoners may be gainfully employed by private business. See RCW 72.09.100(1). This system is entirely voluntary and the statute requires that prisoners be paid a fair wage. We find that our constitution bars the State from selling the involuntary labor of prisoners by use of the contract system of labor. We also find that the contract system of labor bears no resemblance to the program established by RCW 72.09.100(1), and therefore, the legislature had the power to establish this beneficial employment program.

FACTS
From the building of the first prisons, prisoners have been expected to work. William J. Farrell, Prisons, Work and Punishment 26 (1994). State legislatures demanded that prisons be self-supporting, creating a drive for not merely work, but profit. Id. Historically, prisoner labor has not been voluntary. See generally David M. Oshinsky, "Worse than Slavery" Parchman Farm and the Ordeal of Jim Crow Justice (1996) (noting whippings, mutilations, starvation, lack of food and shelter, and mortality rates ranging up to 40 percent annually). Convicts were "let out by contract" or "leased" to private employers who often treated them with extreme brutality. See also State ex rel. Greaves v. Henry, 87 Miss. 125, 40 So. 152, 162 (1906) (Whitfield, C.J., dissenting) (condemning convict leasing as causing "outrages and brutalities which have covered [Mississippi] with unspeakable obloquy."). Leasing and contracting out the labor of prisoners was abandoned in the federal penal system in 1900. See Blake McKelvey, The Prison Labor Problem: 1875-1900, 25 J. Am. Inst. Crim. L. & Criminology 268 (1934). Not long afterward, the Ashurst-Sumners Act of 1935, codified at 18 U.S.C. § 1761, criminalized the interstate transport of prison-made goods and effectively ended the private use of prison labor in state prisons. Ashurst-Sumners was amended in the 1970s to allow the interstate transport of goods made by prisoners in state institutions as long as certain requirements were met: most notably *312 that the prisoners be paid "not less than that paid for work of a similar nature in the locality in which the work was performed," 18 U.S.C. § 1761(c)(2); that the programs be certified; that local business and labor be consulted; that wages be set as to not displace noninmate workers; and that the prisoners be volunteers. See Dep't of Justice, Office of Justice Progs., Prison Industries Enhancement Certification Program Guideline, 64 Fed.Reg. 17000, 17009-01 (Apr. 7, 1999) (hereinafter Prison Indus. Enhancement Cert. Program Guideline). This serves the goal of Ashurst-Sumners, to combat "the evils attending the sale of [prison-made] goods, in the open market, in competition with goods manufactured and produced by free labor." S.Rep. No. 906, 74th Cong., 1st Sess. (1935). Wages must be comparable to combat the problem that "free labor, properly compensated, cannot compete successfully with the enforced and unpaid or underpaid convict labor of the prison." Ky. Whip & Collar Co. v. Ill. Cent. R.R. Co., 299 U.S. 334, 351, 57 S.Ct. 277, 81 L.Ed. 270 (1937) (quoting Whitfield v. Ohio, 297 U.S. 431, 439, 56 S.Ct. 532, 80 L.Ed. 778 (1936)).
In 1981, following the invitation of the amended Ashurst-Sumners Act, Washington State promulgated RCW 72.09.100, which created five classes of prison labor including private employment. Today we are concerned only with .100(1), which empowers the Department of Corrections to establish:
(1) CLASS I: FREE VENTURE INDUSTRIES. The employer model industries in this class shall be operated and managed in total or in part by any profit or nonprofit organization pursuant to an agreement between the organization and the department. The organization shall produce goods or services for sale to both the public and private sector.
RCW 72.09.100(1). This program is administered by "Correctional Industries." See RCW 72.09.070. The statute requires that prisoners be volunteers, that they be paid a comparable wage, and that the impact of any employment program be analyzed to avoid displacing free workers. RCW 72.09.100.[1] There are currently 36 programs certified in Washington State; only one, MicroJet, is before the court at this time.
MicroJet employs prisoners to work in the water jet cutting industry. Water jet cutting uses a waterborne stream of particulates to cut metal or stone into precise shapes. MicroJet and the Department of Corrections entered into a contract "for the purpose of providing work training and/or vocational training for offenders of the Washington State Reformatory." Clerk's Papers (CP) at 5 (Contract Agreement). This contract provides MicroJet with approximately 11,280 square feet of space on the grounds of the reformatory, and sets out provisions for maintenance, liability, security, power and other utilities. It also details how prisoners will come to be employed by MicroJet. "The Department shall provide referrals through the Offender Work Coordinator in accordance with the job descriptions and required qualifications set forth by [MicroJet]. [MicroJet] will in turn interview and hire." CP at 9. The contract requires "[m]andatory compliance [with] applicable federal state and local laws, ordinances and regulations." CP at 13.
Water Jet is an informal association of businesses and individuals who do similar work. Water Jet brought suit on various theories in the hope of voiding the MicroJet contract and receiving money damages. The trial court dismissed claims based on Ashurst-Sumners, 42 U.S.C. § 1983, and Washington *313 Constitution article II, section 29, and all claims brought against the Piels, owners of MicroJet, in their individual capacity. Water Jet voluntarily dismissed their remaining causes of action and sought direct review on only the claims based on the state constitution and Ashurst-Sumners. We accepted review and affirm the trial court.

STANDARD OF REVIEW
A duly enacted statute is presumed constitutional. State v. Sullivan, 143 Wash.2d 162, 180, 19 P.3d 1012 (2001). The party challenging the statute must demonstrate its unconstitutionality beyond a reasonable doubt. 1519-1525 Lakeview Blvd. Condo. Ass'n v. Apartment Sales Corp., 144 Wash.2d 570, 577, 29 P.3d 1249 (2001).

STRUCTURE OF ARTICLE II, SECTION 29
First we look at the structure of the constitutional provision. Article II, section 29 contains two clauses: (1) "the labor of convicts of this state shall not be let out by contract" and (2) "the legislature shall by law provide for the working of convicts for the benefit of the state." Both clauses limit the plenary power of the legislature to act or not act as it sees fit. See, e.g., State v. Foster, 135 Wash.2d 441, 458-59, 957 P.2d 712 (1998); State v. Russell, 125 Wash.2d 24, 61, 882 P.2d 747 (1994); State v. Gunwall, 106 Wash.2d 54, 67, 720 P.2d 808 (1986). The first clause restricts the traditional power of the State to lease or sell the labor of convicts to private parties under the contract system. The second clause restricts the power of the State to let convicts sit idle; it mandates that the legislature provide work for convicts to benefit the State.

PLAIN LANGUAGE
The words of the constitution are interpreted as they would have been commonly understood at the time the constitution was ratified. State v. Brunn, 22 Wash.2d 120, 139, 154 P.2d 826 (1945); see also Robert F. Utter, Freedom and Diversity in a Federal System: Perspectives on State Constitutions and the Washington Declaration of Rights, 7 U. Puget Sound L.Rev. 491, 509-10 (1984).
The first clause of article II, section 29 provides that "the labor of convicts of this state shall not be let out by contract to any person, copartnership, company or corporation." Therefore, the common meaning in 1889 of "shall not be let out by contract" is critical. An examination of the plain language in historical context demonstrates that "let out by contract" refers to the contract system of convict labor.
The exact phrase is used in a contemporaneous territorial newspaper in an article on the harshness of the contract system of convict labor used in the Washington Territory. The Lewis County Nugget reported prisoners' complaints of being forced to wear heavy balls and chains while working, and of other harsh conditions at the prison. The Nugget suggested prisoner labor would be more profitable for "the Territory to take it in charge instead of letting it out by contract." Visit to the Territorial Penitentiary, Lewis County Nugget (Chehalis), Aug. 4, 1883, at 1 (emphasis added). In the 1880s, the common and ordinary meaning of letting out the labor of convicts by contract referred to the contract system of convict labor in the territorial prison.
A dictionary published near the date of the constitutional convention defined "let" as: "To grant possession and use for a compensation; to lease; as, to let an estate for a year; to let a room for lodgers;often followed by out." American Dictionary of the English Language 766 (1899) (emphasis added). We believe that this is the definition that the founders had in mind. Given that, we properly read the provision to say: "[T]he labor of convicts of this state shall not be [leased, rented out] by contract to any person."
We note that there is very little in the history of this nation or of prisons that supports the contention that allowing prisoners to work for private enterprise has been a major concern. In fact, we have found no evidence that allowing prisoners to work as employees was ever contemplated historically. There is, however, considerable support in the history of this nation and our State that supports the contention that forcing *314 prisoners to work under the control of private contractors was of major concern and that many interest groups allied to fight the practice. See, e.g., McKelvey, supra, at 254; see also Prison Indus. Enhancement Cert. Program Guideline (organized labor, human rights activists, and others argued to Congress that the flow of goods made by prison labor had had an adverse impact on the nation).
Next we look at the plain language of the second clause of article II, section 29, which provides: "and the legislature shall by law provide for the working of convicts for the benefit of the state." Appellants argue the phrase means that prisoners must work for the State, in state-owned and operated industries. We disagree. If the framers had intended that, they would have simply stated "for the state." Instead, they chose to use the expansive phrase, "for the benefit of the state." If the members of the constitutional convention had intended that convicts must be employed directly by the State, they would have expressed that requirement in a simple, clear statement.
The 1899 dictionary definition of "benefit" is quite broad: "Whatever contributes to promote prosperity and personal happiness, or adds value to property; advantage: profit." American Dictionary, supra, at 125. The delegates knew then, just as we know now, that keeping inmates employed benefits the State. By the time of our constitutional convention, "in fact, it had become recognized, and was so recognized by all students interested in the reformation of prisoners, that regular labor of some kind was necessary and essential for good order within the prison walls." Utah Mfrs. Ass'n v. Mabey, 63 Utah 374, 226 P. 189, 189 (1924). Prison officials in Washington knew that providing work for the convicts was essential, the benefits of which "cannot be estimated in dollars and cents as is shown by all the best penologists of the day." State of Wash., Annual Report of the Penitentiary Commissioners 4 (1890). Providing useful work not only reduced the cost of maintaining the convicts but was also of "great benefit from a mental, moral and physical standpoint." State of Wash., Gov. Chas. E. Laughton, Message to the Washington Legislature 45 (1891).
Thus, it is clear the framers contemplated benefits beyond monetary profit in providing employment to inmates. The framers used "benefit" in its commonly understood sense of "advantage." In light of the use of its terms at the time the state constitution was propounded, we find that article II, section 29 does not prohibit the private employment of prisoners.

HISTORICAL CONTEXT
In order to understand the meaning and purpose of a constitutional provision, we must look at the historical context in which it was adopted. Westerman v. Cary, 125 Wash.2d 277, 288, 892 P.2d 1067 (1994). While this is true of all constitutional provisions, it is especially pressing here because the prison system and circumstances of convict labor in 1889 were so very different than today.
The appellants claim that labor interests were the single overriding historical influence in the development of article II, section 29 and that the primary goal of delegates was to prevent competition between convict labor and free labor. This is not supported by history.[2]
"The history of the prison is in large measure a history of prison labor." Stephen P. Garvey, Freeing Prisoners' Labor, 50 Stan. L.Rev. 339, 342 (1998). The first prisons in the United States were organized around the concept of work to reform the inmate. James J. Misrahi, Note, Factories with Fences: An Analysis of the Prison Industry Enhancement Certification Program in Historical Perspective, 33 Am.Crim. L.Rev. 411, 413 (1996). Prisons were an economic drain on the community. A movement to make the prisons self-supporting became the driving force behind American penal policy in the nineteenth century. William J. Farrell, Prisons, Work and Punishment 27 (1994). Believing *315 that they were simultaneously achieving financial and reformist goals, prison administrators made contracts with private manufacturers to lease convict labor. Id.
Different models developed, but the primary systems were the lease system and the contract system. They shared the essential features that prisoners worked involuntarily, overwhelmingly without compensation, as assigned, under the direct or indirect control of the private contractor who was given a free hand to punish and reward inmates.
By 1880, the model established in every southern state was the lease system. Farrell, supra, at 91. Under the lease system, inmates worked outside the prison, generally on railroads, in mines or on agricultural projects under the complete control of the private lessees. Misrahi, supra, at 415-16. In effect, the State dismissed convicts from its control and put them at the mercy of lessees who had little interest in reform or proper control and maintenance of the prisoners. Henry v. State, 87 Miss. 1, 39 So. 856 (1906). One of the major problems with the leasing system, "and one which led to its ultimate demise, was the complete lack of governmental control over the custody and care of prisoners." 1985 S.C. Op. Att'y Gen. Nos. 85-821, at 217 (1985). Historians have documented horrific abuses and huge mortality rates. See generally Oshinsky, supra; see also State ex rel. Greaves, 87 Miss. 125, 40 So. 152.
In the northern states, when Washington was still a territory, a contract system prevailed. Under the contract system, prison officials and private contractors entered into legal agreements under which the prison would furnish a certain number of prisoners at a fixed price. Misrahi, supra, at 415. The labor of the convict was sold to the highest bidder by private companies who paid the State for this privilege. See Josey v. DuBois, 6 Mass. L. Rptr. 287, 1996 WL 754890 (1996). Most of the work was done inside the prisons, which often became prosperous factories for the private contractors. Farrell, supra, at 93. Corruption and cruelty were standard. Id.
By 1874, the legislature of the Washington Territory recognized there were too many convicted felons to continue the practice of housing inmates in the county jails and a central prison was needed. Wash. State Dep't of Inst., State PrisonA History of Adult Corrections in Washington, Perspective 5 (Spring-Summer 1966) (hereinafter Perspective ). The federal government offered to turn over the McNeil Island federal facility for $36,000. Id. Two independent counter-proposals for the housing of convicts were made by William Billings, the Thurston County Sheriff, and Jerry Smith, former Pierce County Sheriff. Id. Both men offered to construct a prison and take custody of the inmates in return for a subsistence allowance and the right to the labor of the convicts. Id. Other entrepreneurs recognized the profitability of such an arrangement and "[s]oon the legislature was beset by a horde of public-spirited citizens, all anxious to relieve the territory of its custodial problems." Id. Billings and Smith combined their proposals and used their political influence to gain legislative approval of the contract, which was then signed by the territorial governor. Id. The local paper complained that in giving the six year "lease" to Billings, the territorial legislature had conferred "a special privilege to the fullest extent." In a Quandry, Washington Standard (Olympia), Nov. 24, 1877, at 1.
Under the contract, Smith and Billings received 70 cents per day per inmate, an additional $500 for transportation costs, and all proceeds of the convicts' labor. Smith and Billings joined with a third partner, Oliver Shead, who provided the land and $4,000 cash for the construction of what would be called Seatco prison, in what is now Bucoda, south of Olympia. Perspective, supra, at 6.
Seatco "was operated under a `contract' system." James M. McCauley, A Review of the Washington State Penitentiary 1886-1939, at 1 (1939). The contract system, as practiced in Washington, had many of the features of the southern lease system, probably because, like much of the South, Washington Territory had no state-owned facility to house the convicts. Billings and his partners were free to use the convicts in any way they saw fit. Pioneer Reminiscences, in *316 Early History of Thurston County, Washington 276-77 (Mrs. George E. Blankenship, ed., 1914). As with the lease system, the contractors personally retained all the profits of the convicts' labor and had complete control of the prisoners housing, clothing, feeding, providing medical assistance to and guarding the inmates at their own facility. Id.
Billings and his partners started a cooper factory for building barrels, and created the Seatco Manufacturing Company for making sashes, doors, and blinds. The partnership also leased convicts to nearby farms. In addition, they developed a coal mine worked by inmates. Shead was part owner of a sawmill and he assisted Smith and Billings in buying out the other partners so that the three could then run the sawmill on prison labor for free. Neil B. Corcoran, BucodaA Heritage of Sawdust and Leg Irons 24-26 (1976). The Billings partnership was hugely profitable.[3]
Seatco gained a widespread reputation for brutality. Perspective, supra, at 7; see generally George W. France, The Struggles for Life and Home in the North-West (1890).[4] In order to cut down on the expense of guards, prisoners wore iron ankle cuffs riveted to each ankle and fastened together by long chains. Each weighed between 10 and 18 pounds, and the inmates wore them round the clock. Frequent punishments included a bread and water diet, exposure to cold, the whipping post, and freely administered kicks and blows by the guards. Perspective, supra, at 7; France, supra, at 257.
An exposé by a Seattle paper charged that the treatment of the prisoners at Seatco "was of a sort better adapted for the care of animals than human beings." The Penitentiary, Seattle Weekly Chronicle, Oct. 4, 1883, at 4. The paper criticized the contract system at Seatco as a "system wrong in principle, and doubly so in practice. It opens the door for the entrance of personal greed of gain, cruelty and neglect of men so kept." Id. Public pressure caused Governor Newell to seek legislative approval to provide removable irons for the inmates. Corcoran, supra, at 27. The territorial legislature approved his initial request though it took another three and one-half years before removable irons were provided. Id.
As newspapers published accounts of the abuses at Seatco, calls were made for a more thorough legislative investigation to ensure that "the cupidity of contractors, and the natural thirst for cruelty which is the usual result of absolute power, do not overleap the line of simple justice." Seattle Weekly Chronicle, Oct. 4, 1883, at 4.
Demands were made to appoint a qualified warden in place of Billings' hired superintendent. They appropriated $600 per year for such an official. However, the territorial governor then appointed the former employee of the contractors to continue in charge. Perspective, supra, at 7.
In 1886, the legislature decided to take direct control over the prisoners and voted to abandon the contract system, although Billings and his political allies fought hard to keep it. Perspective, supra, at 7; France, supra, at 284-85, 309. Even after the legislature approved a penitentiary at Walla Walla, the Billings partnership was almost successful in derailing the plan. France, supra, at 284. The territorial governor appointed three building commissioners, who visited Oregon and California institutions, and then returned with recommendations for the new prison. Perspective, supra, at 7. Finally, in *317 1887, Seatco was vacated, ending a "dark spot in the history of the territory." E.T. Short, After Many Years, Tacoma Times, May 25, 1939.
When prisoners were transferred to Walla Walla, one of the first requests of the new warden was for work for the inmates because he was concerned about the effects of idleness. The inmates produced bricks for use at the prison and later made jute bags for sale to farmers. The Walla Walla State Penitentiary still stands.
The myriad problems inherent in the contract and leasing systems of convict labor spurred a national movement to reform prison labor systems. This movement was spearheaded by labor groups, small businesses, humanitarian organizations, and prison reformers. In response, the majority of states passed statutes or adopted constitutional provisions that restricted or prohibited the contract and lease systems of convict labor. Misrahi, supra, at 97-98.
It is against this backdrop that the delegates to Washington's constitutional convention met in 1889 and considered the proposals that ultimately became article II, section 29. It is true that across the country, labor organizations opposed the competition of convict labor. However, to say that the Washington delegates' opposition to the leasing system was based solely, or even primarily, on the concern for labor interests denies the extensive reputation for brutality, corruption, and ineffectiveness that the contract system of convict labor had in the Washington Territory and throughout the country.
There was a strong populist influence at the time of the constitutional convention. Populists sought to protect the ordinary people against unfair advantages created by coalitions between big government and politically connected big business. The populist movement was opposed to the corruption inherent in the contract system in the Washington Territory. Delegates to our state constitutional convention feared "the tyranny of corporate power and special interests that might capture control or otherwise corrupt governing institutions." Cornell W. Clayton, Toward a Theory of the Washington Constitution, 37 Gonz. L.Rev. 41, 66 (2002)(emphasis omitted). In adopting article II, section 29, the delegates restricted the legislature's traditional power over convict labor in an effort "to protect against special interest legislation." Clayton, supra, at 68. It was special interest legislation that had authorized, and then extended, the Billings contract. The corruption, cruelty, and exploitation of convict labor at Seatco, along with the political favors granted the contractors, were well known throughout the territory at the time of the constitutional convention. France, supra, at 309-12. The delegates to the constitutional convention prevented such special interest legislation, and the corruption of government institutions by the contract system of convict labor, from occurring again. Such problems do not accrue to voluntary, private employment.

FRAMER'S INTENT
The only contemporaneous reports of the discussion of article II, section 29 appeared in two newspapers, the Tacoma Daily Ledger and the Tacoma Morning Globe. The Ledger article is entitled, "Convict Labor, Delegates Oppose Leasing the Services of Criminals to Corporations." Tacoma Daily Ledger, Aug. 10, 1889, at 4. Two of the committees' nine members voiced an objection to convict labor competing with free labor. Id. The only other report of the deliberations on article II, section 29 appeared in the Tacoma Morning Globe. That report in its entirety stated: "Section 32, forbidding the leasing of convict labor, was taken up. West wanted to strike it out but Griffitts, Moore, Reed, Prosser, and Buchanan strongly opposed this motion and it was defeated." Tacoma Morning Globe, Aug. 10, 1889, at 1. The reports of both papers make clear that what the delegates were debating was the "leasing" of convict labor. What they prohibited was the system of convict labor under which convicts were leased or contracted out.
Labor interests were unsuccessful in their attempts to prohibit the private employment of prisoners. A labor union had petitioned the delegates to include the following provision, "Convict labor shall not be employed in competition with free labor." Tacoma *318 Daily Ledger, July 18, 1889, at 1. The delegates rejected the provision. We decline to give article II, section 29 the precise meaning the framers refused to adopt.

UTAH, NEW YORK, OKLAHOMA
The majority of states which have considered the meaning of their statutory or constitutional provisions abolishing contract or lease system of convict labor have rejected the proposition that such provisions were intended to prevent competition with free labor.
Like Washington, Utah prohibited contract labor in its 1896 constitution. When interpreting its parallel provision, the Utah court noted:
It commands or directs the Legislature to prohibit contracting convict labor. Historically, the phrase "contracting convict labor" may be said to have had a well-understood meaning at the date of the adoption of our state Constitution. In the early days of the republic it was the custom of the states to lease or hire to private individuals convict labor and at a later date to lease or hire such labor to individuals or corporations. The cruelty to the prisoners, together with the general abuse of the system, in that the states received little, if any, compensation for the services of the prisoners rendered, had raised such opposition and public criticism that many of the states had, prior to the adoption of the Constitution of this state, prohibited officials from entering into contracts for the labor of prisoners.
Utah Mfrs. Ass'n, 226 P. at 189. The Utah Supreme Court clearly understood "contracting" to mean the contract system of convict labor. The court concluded that the work program complained of by plaintiffs did not have "any of the elements of `contracting convict labor,' as that phrase is and was generally understood." Id. Therefore, the work program did not violate the constitutional provision. Id.
Similarly, in People v. Hawkins, 157 N.Y. 1, 12, 51 N.E. 257 (1898), the court interpreted New York Constitution 1894, article 3, section 29, which required the legislature to provide for the working of inmates and forbade the labor of convicts "be farmed out, contracted, given or sold to any person, firm, association or corporation." Id. There the court rejected the argument that the constitutional provision "indicates and expresses a public policy on the part of the state to suppress the competition of prison labor with free labor." Id. "Surely, the poverty of our language is not such as to preclude the framers of the fundamental law from giving plain and direct expression to such a simple thought." Id. at 13, 51 N.E. 257. The court held instead that the constitutional provision addressed "practices that had formerly existed, under which the labor of convicts had become a subject of bargain and sale. It simply abolished what was known as the `contract system' of labor in prisons." Id.
Similarly the Supreme Court of Oklahoma found Oklahoma's parallel constitutional provision prohibited the contract system of labor. Rice v. State ex rel. Short, 108 Okla. 4, 232 P. 807, 813 (1924). The provision reads: "The contracting of convict labor is hereby prohibited." Okla. Const. art. XXIII, § 2. The court held this was aimed at eliminating "the practices then existing in some states of leasing or farming out convicts to individuals or private corporations." Rice, 232 P. at 813. "We cannot believe that the Constitution makers had in mind the protection of free labor from competition with convict labor. Had they so intended, they would have said so." Id. We agree.
Like the courts of Utah, New York, and Oklahoma, we do not believe the framers of our constitution intended article II, section 29 to protect free labor from competition with convict labor. Indeed, they were invited to adopt a provision that would have clearly and simply prohibited such competition, but declined to do so. Therefore, voluntary private employment is not constitutionally prohibited.

CALIFORNIA AND ILLINOIS
Some of these issues before us today were considered in Pitts v. Reagan, 14 Cal.App.3d 112, 92 Cal.Rptr. 27 (1971). Our constitutional provision is almost identical to the provision California adopted in 1879. Under *319 that provision, the California Court of Appeals invalidated a program in which the State leased to agricultural growers the services of inmates to harvest crops. The constitutional problem in Pitts was that "[t]here were no individual contracts between the growers and the prisoners." Pitts, 14 Cal. App.3d at 116, 92 Cal.Rptr. 27. The only contracts that existed were between the growers and the State. Id. This is precisely what the California state constitution prohibited.
The Pitts court stated, and all parties agreed, that a "convict may himself sell or hire out his services to a private person, and that parole or other state officials may assist in that rehabilitative effort." Pitts, 14 Cal. App.3d at 117, 92 Cal.Rptr. 27 (emphasis added). This accurately describes our Class I industries. Each Class I inmate employee has an individual employment contract with his employer. The State assists the inmate in obtaining the job, but does not assign the inmate to the employer.
In addition, the harvesting program was not legislatively authorized even though it is the legislature that decides how inmates work. Nor did the program have a rehabilitative purpose that might have brought it within an existing California statute authorizing rehabilitative work programs. The opposite is true of our case. Our Class I industries are specifically authorized by statute to meet rehabilitative goals.
Our attorney general considered a similar factual scenario long ago. See 1934 Op. Att'y Gen. No. 318. The Department of Corrections had asked the Washington attorney general if a plan to trade convict labor to a local nursery in exchange for plants for the prison violated article II, section 29. The attorney general properly responded that the State is not allowed to trade the labor of convicts for products. Like Pitts, the arrangement was not legislatively authorized, did not contain individual employment contracts entered into by the prisoners, and had no rehabilitative purpose. Like Pitts, it had the hallmarks of the forbidden contract system and it was properly disallowed by the attorney general. This is critically different from the system authorized by the legislature with RCW 72.09.100(1), which merely creates a structure in which private employers may enter into a voluntary employment relationship with prisoners for the purpose of rehabilitative goals set out by statute.
In 1932, the Illinois Court of Claims[5] considered the meaning of their provision, which was somewhat similar to our own.[6]K. & S. Mfg. Co. v. Illinois, 7 Ill. Ct. Cl. 107 (1932). The Illinois constitution is one we pay especial attention to because much of our own was drawn from it. However, we find the Court of Claims' conclusion that private employment of prisoners is unconstitutionally unpersuasive. The Court of Claims' reasoning was based largely on a 1903 law which greatly restricted the sale of prison made goods. Id. The Court of Claims did not discuss the history, the debates, or any of the other tools that this court uses to determine the meaning of the constitutional text, and thus its opinion is of limited value in interpreting our article II, section 29.
We find far more persuasive the experience of our western counterparts, which were especially concerned about special interests' potential to corrupt governmental institutions. Clayton, supra, at 66, 68, 83 (noting the influence of other western states adopting constitutions during the same period).[7] In adopting article II, section 29, the delegates restricted the legislature's traditional *320 power over convict labor "to protect against special interest legislation." Clayton, supra at 68.
A review of the case law from other states and of the history from our own State supports our conclusion that our constitution, like so many of our sister states, prohibits the contract system of convict labor, not private employment of prisoners.

LEGISLATIVE HISTORY
Our State's legislative history shows that our State has always understood that article II, section 29 prohibited contract labor and mandated work programs for the benefit of the State.
In his 1891 address to the legislature, our governor reminded legislators they were "required to provide for the working of convicts for the benefit of the state" and asked them to fulfill "[t]his mandate of the Constitution" by passing legislation providing for the establishment of a jute factory at Walla Walla.[8] State of Wash., Gov. Chas. E. Laughton, Message to the Legislature (1891). The legislature accordingly authorized funds for the jute factory and for brick making equipment, and directed the superintendent "to dispose of the articles manufactured and not needed by the state, for cash, at private sale." 1 Ball.Code § 2747 (Laws of 1891, ch. 147, § 18).
In 1927, the legislature provided: "Every prisoner in the reformatory shall be required to work in such manner as may be prescribed by the director of business control: Provided, That prisoners shall not be employed in what is known as the contract system of prison labor." 10 Rem.Rev.Stat. 10280-7 (Laws of 1927, ch. 212, § 7). This legislation simply restates the constitutional provision in reverse order: the director of the corrections department must provide work and can require the prisoners to work in pursuance of penal goals, as long as the contract system of labor is not revisited.
Similarly, in 1943 and 1959, the legislature again codified both portions of article II, section 29. Those statutes provide, in part, the secretary "shall have the power and it shall be his duty to provide for the useful employment of prisoners ... Provided, That no prisoners shall be employed in what is known as the contract system of labor." Rem. Supp. § 10279-1 (Laws of 1943, ch. 175, § 1); Former RCW 72.64.010 (Laws of 1959, ch. 28, § 72.64.010). The legislature interpreted "for the benefit of the state" to mean "useful employment" as determined by the secretary. While it is not conclusive, the phrasing would be awkward if the legislature intended to ban private employment of prisoners, but it easily conforms to an intention to give the secretary broad powers to provide for employment of prisoners while not violating the constitutional ban on reviving the contract system of labor.
In enacting chapter 72.09 RCW in 1981, the legislature designed a work program which avoided the hallmarks of the contract system and provided employment opportunities to the inmates which benefit the State. Chapter 72.09 RCW is part of a complete overhaul of the Department of Corrections begun in 1979 with establishment of the House Select Committee on Corrections. Over an 18-month period the committee heard the recommendations of a 90-person advisory task force and the written and verbal testimony of more than 450 individuals and organizations in more than 100 hearings.[9] Office of Prog. Research, An Overview, H.B. Rep. 235, at 1 (Wash. Mar. 2, 1981). The committee visited and studied *321 every adult correctional facility and program in the state, as well as some in five other states. Id. The committee recommended "[t]otal reform of inmate work programs." Id. at 2. A series of basic principles were identified in establishing new work programs. They were:
 The work ethic must be established in prisons;
 Work programs should be modeled as closely as possible after the free enterprise system;
 There must be incentives for good performance and disincentives for poor performance;
 There must be a flexible wage scale for inmates which reduces unfair competition with private business by institutional industries;
 Inmates should be required to share in the cost of corrections, and pay for restitution, and family support; and
 Idleness in our institutions is destructive and must be eliminated as soon as possible.
Id. The Class I industries statute was designed to implement these goals, which clearly benefit the State.
During the senate debates on proposed legislation, article II, section 29 was read aloud. The senators' discussion included an explanation that the constitution prohibits the lending of convict labor, but that Class I industries inside the prison are not prohibited because they are for the benefit of the State. Audio tape: Senate Floor Debates of H.B. 235, Correctional Reform (cassette 2) (Apr. 26, 1981).
Pursuant to the statute, MicroJet and the Department of Corrections entered into a contract "for the purpose of providing work or training and/or vocational training for offenders of the Washington State Reformatory." CP at 5 (Contract Agreement). An offender work coordinator assists in referring inmates who wish to work for an employer. "The Contractor will then interview and hire." CP at 9. The employment contract is between the inmate and the employer.
To refer a prisoner who voluntarily seeks employment is not to force him to work for a private employer without compensation. Cf. Rector v. Cherry Valley Timber Co., 115 Wash. 31, 34-35, 196 P. 653 (1921) ("[W]here convict labor is contracted to private employers, such labor is involuntary.... [The convict] was sent there against his will and despite his protest."). Inmates working in Class I industries do so voluntarily.[10] These circumstances replicate as closely as possible the free enterprise system, one of the principles established by the House Select Committee on Corrections.
Both state and federal statutes protect against prison industries incorporating the hallmarks of the contract system. Federal safeguards are provided through the Federal Prison Industry Enhancement Certification Program (PIECP), codified at 18 U.S.C. § 1761(c). Washington law and PIECP certification require voluntary inmate participation, wages comparable to those paid[11] in the free labor force, analysis of the local labor market, consultation with organized labor and private industry, and annual audits by the Federal Bureau of Justice Assistance to ensure compliance with PIECP's requirements. 18 U.S.C. § 1761(c); CP at 92-94, 139-40, 157-71.
Allowing inmates who wish to be employed to work for Class I industries benefits this State. Recidivism, violent incidents among prisoners, and the taxpayer's burden are reduced as a result of the program. Accord Misrahi, supra, at 433. One state study indicates prison industries reduce recidivism by 50 percent.[12] In addition, the mandatory *322 contributions Class I employees make to the cost of their incarceration supports their own dependents and makes more likely the restitution of their victims. Misrahi, supra, at 434-35.

CONCLUSION
A review of the structure and language of article II, section 29 in light of the historical record makes clear that "let out by contract" would have been understood to refer to the contract and leasing systems of convict labor. Academic literature, cases from other states, and our legislative history all support this interpretation. Our constitution requires the legislature to provide work for our inmates without resurrecting the contract system.
RCW 72.09.100(1) is not the contract system revitalized. It explicitly provides for voluntary labor at a competitive wage, for the express goal of rehabilitation, under the custody and control of the State for the benefit of our State. We therefore conclude that RCW 72.09.100(1) is constitutional.

ASHURSTSUMNERS[13]
Next, we must determine if the trial court erred in dismissing claims based on the Ashurst-Sumners Act, 18 U.S.C. § 1761, including Water Jet's 42 U.S.C. § 1983 claim. Ashurst-Sumners does not explicitly create a cause of action.[14] Every court that has considered the matter has found that Ashurst-Sumners does not impliedly create a private cause of action, or rights enforceable through § 1983. See McMaster v. Minnesota, 30 F.3d 976, 981-82 (8th Cir.1994) ("Ashurst-Sumners does not provide a private cause of action, either expressly or by implication. Furthermore, Ashurst-Sumners creates no federal right enforceable by way of 42 U.S.C. § 1983."); Wentworth v. Solem, 548 F.2d 773, 775 (8th Cir.1977). Accord Gonzaga University v. Doe, 536 U.S. 273, 122 S.Ct. 2268, 153 L.Ed.2d 309 (2002). We concur, and affirm the trial court's dismissal of claims based on Ashurst-Sumners.

OVERALL CONCLUSION
We affirm the trial court's dismissal of appellants' claims. RCW 72.09.100(1) is not unconstitutional under article II, section 29, which only prohibits the contract system of convict labor, not the private, voluntary employment of prisoners. Further, we hold that Ashurst-Sumners does not create a private cause of action, or rights enforceable via a § 1983 action.
WE CONCUR: JOHNSON, MADSEN, IRELAND, and OWENS, JJ.
BRIDGE, J., (dissenting).
The majority has determined that it is constitutionally permissible for the Washington State Department of Corrections (Department) to enter into contracts with private businesses to employ prisoners in the production of goods and services for sale in the public and private sectors. Because I disagree with the majority's assertion that our constitution was only meant to prevent the abuses of the "contract system of labor"[1] rather than all contracts for prison labor between the State and private employers, I respectfully dissent.
*323 Article II, section 29 of the Washington State Constitution provides that "the labor of convicts of this state shall not be let out by contract to any person, copartnership, company or corporation, and the legislature shall by law provide for the working of convicts for the benefit of the state." It took nearly 70 years after the framers adopted this section for the legislature to issue a mandate to the Department to develop inmate work programs. See RCW 72.64.010.[2] Then in 1981,[3] the legislature enacted the Corrections Reform Act of 1981, chapter 72.09 RCW, providing for five classes of prison labor. See RCW 72.09.100. The first class of prison labor in RCW 72.09.100, Class I: Free Venture Industries, permits inmate work programs that are operated and managed by private profit or nonprofit entities other than the Department.[4] RCW 72.09.100(1).
It seems obvious that RCW 72.09.100(1) is unconstitutional because it directly conflicts with the plain language of article II, section 29 of the Washington State Constitution. The historical context of article II, section 29including the debates at the Washington Constitutional Convention of 1889, the populist and labor movements, and the prison work programs implemented immediately preceding Washington's conventionsupports this conclusion. In addition, decisions construing similar constitutional provisions from California and Illinois are persuasive and consistent with this interpretation.

I

CLASS I: FREE VENTURE INDUSTRIES
Pursuant to the authorizing legislation, the Department created a program of inmate labor called "private sector partnerships." See Clerk's Papers (CP) at 22-30. The Department enticed employers with the promise of lower overhead costs and a motivated and readily available work force. Id. The Department's promotional materials presented the allure of a higher profit margin, stating:
By employing highly motivated workers and lowering your overhead rate by operating within an institution, you make money. If you don't have your own manufacturing plant or are unhappy with an out-of-state or offshore supplier, you can lower your procurement costs and get better service by contracting with Correctional Industries.
CP at 23. Businesses were told that they could save the costs of health insurance and other employment-related benefits, and could potentially receive bid preferences on state contracts. CP at 24. The Department, meanwhile, would also benefit because inmates would obtain training and skills that could help them become an integral part of society when released from confinement. Further, employment would potentially encourage a work ethic among inmates. The inmate workers would also pay taxes on their *324 earnings, and wage deductions would be available to compensate victims and/or provide child support payments.
Consistent with its promotion, the Department entered into a contract with Jet Holdings, Ltd., d/b/a MicroJet (MicroJet) that allows MicroJet to use prison labor from the Monroe Corrections Center in its water jet cutting business.[5] CP at 5-16, 18. In addition to providing access to prison labor, the contract allows MicroJet to use more than 11,000 square feet of industrial space at the correctional facility rent-free. Many utilities are provided to MicroJet free of charge or at discounted rates. The Department also agreed to provide security and a security orientation session. Under the terms of the agreement, the Department refers prison inmates to MicroJet. MicroJet interviews and hires the inmates, and then pays their wages to the Department as trustee for the inmate-workers. Clearly, under Class I: Free Venture Industries, inmates are being "let out by contract" to a private company in contravention of the Washington State Constitution.

II

ARTICLE II, SECTION 29
After the first day of January eighteen hundred and ninety the labor of convicts of this state shall not be let out by contract to any person, copartnership, company or corporation, and the legislature shall by law provide for the working of convicts for the benefit of the state.
Const. art. II, § 29.
A. Plain Language: When interpreting constitutional provisions, we look first to the plain language of the text and will accord it its reasonable interpretation. Anderson v. Chapman, 86 Wash.2d 189, 191, 543 P.2d 229 (1975) (citing State ex rel. Evans v. Bhd. of Friends, 41 Wash.2d 133, 247 P.2d 787 (1952)). If the text is clear, then no construction or interpretation is necessary. Id. The words of the text will be given their common and ordinary meaning, as determined at the time they were drafted. State ex rel. O'Connell v. Slavin, 75 Wash.2d 554, 557, 452 P.2d 943 (1969) (citing State ex rel. Albright v. City of Spokane, 64 Wash.2d 767, 394 P.2d 231 (1964)). This court may also examine the historical context of the constitutional provision for guidance. See Yelle v. Bishop, 55 Wash.2d 286, 291, 347 P.2d 1081 (1959) ("In determining the meaning of a constitutional provision, the intent of the framers, and the history of events and proceedings contemporaneous with its adoption may properly be considered.").
A bifurcation of section 29 reveals its intended purpose and scope. The first clause of section 29 provides, "[a]fter the first day of January eighteen hundred and ninety the labor of convicts of this state shall not be let out by contract to any person, copartnership, company or corporation." Const. art. II, § 29. A dictionary published in the same year as the adoption of Washington's constitution provides as its first entry that "let" means "[t]o permit or allow ... grant or afford liberty." 3 THE CENTURY DICTIONARY 3418 (1889). "[A]ny person, copartnership, company or corporation" means any private, nongovernmental entity. Thus, a plain reading of this first section provides that the Department cannot "permit or allow" a private entity to contract for convict labor.
The second section modifies the first. It states, "and the legislature shall by law provide for the working of convicts for the benefit of the state." Const. art. II, § 29. According to this language, the legislature may, and is in fact required to, provide work for convicts. However, the convict labor is intended "for the benefit of the state" rather than for the benefit of any "person, copartnership, company or corporation." The two sections, read together, then, indicate that labor for the benefit of the State is mandated, while labor for the benefit of a private enterprise is prohibited.
The majority, on the other hand, asserts that in 1889 the ordinary meaning of "let out by contract" referred solely to the "contract system of labor." The "contract system of labor" was a type of prison labor program *325 that existed in most Northern states by the end of the 1870s under which the State entered into an agreement with a private entity for the labor of the convicts, which was performed within or near the prison. WILLIAM J. FARRELL, PRISONS, WORK AND PUNISHMENT 28 (1994); James J. Misrahi, Note, Factories with Fences: An Analysis of the Prison Industry Enhancement Certification Program in Historical Perspective, 33 AM.CRIM. L.REV. 411, 415 (1996). The convicts employed under the contract system were compelled to work, frequently with no safety precautions, which led to numerous accidents. FARRELL, supra, at 95. There were also frequent allegations of corruption and bribery. Id. at 92.
Although the majority maintains that inmates were treated with extreme cruelty under the contract system, the sources relied upon actually discuss the brutality that existed under the lease system rather than the contract system. See majority at 311 (citing DAVID M. OSHINSKY, "WORSE THAN SLAVERY" PARCHMAN FARM AND THE ORDEAL OF JIM CROW JUSTICE (1996) (discussing the history of the lease system in Mississippi) and State ex rel. Greaves v. Henry, 87 Miss. 125, 40 So. 152, 162 (1906) (Whitfield, C. J., dissenting) (discussing the evils that occurred in the past under the lease system)). The lease system, which existed primarily in the South, was different from the contract system in that the convicts were under the complete control of the private lessees. Misrahi, supra, at 416. Under the lease system, "inmates were subject to unspeakable brutality." Stephen P. Garvey, Freeing Prisoners' Labor, 50 STAN. L.REV. 339, 357 (1998). The contract system was different, however, as the "treatment of so-called free workers was not very different from that of inmate workers." Misrahi, supra, at 416. Thus, the contract and lease systems were distinct, and the horrors of one cannot necessarily be attributed to the other.
The majority maintains that the framers of our constitution sought to prevent the inhumane, corrupt, and involuntary nature of the contract system of convict labor by drafting article II, section 29. However, the majority contends that the framers did not intend to prevent all contracts between the State and private entities for the labor of prisoners. Section 29 makes no mention of restricting convict labor to that which is voluntary nor does it specifically state that the "contract system of labor" was thereby abolished. Furthermore, the second clause of section 29, which provides that the State must benefit, indicates that what was being forbidden was broader than simply the "contract system of labor."
B. Historical Context: The plain language interpretation of section 29 is further supported by the historical context surrounding the Washington Constitutional Convention of 1889. This court has stated that "[i]n determining the meaning of a constitutional provision, the intent of the framers, and the history of events and proceedings contemporaneous with its adoption may properly be considered." Yelle, 55 Wash.2d at 291, 347 P.2d 1081.
It was competition with free labor, rather than the cruelty of the system as the majority asserts, that led to the eradication of private sector involvement in convict labor in the late nineteenth century. "The long-term and sustained efforts of free laborers and manufacturers, rather than the concerns of convict exploitation, led to the eventual abolition of private sector involvement in prison industry." Misrahi, supra, at 417; see also Garvey, supra, at 342 ("Prison labor disappeared primarily because organized labor unions and business organizations wanted to eliminate the competition."). Commenting on the push to end convict leasing in Mississippi, one author states that its termination was not pursued on "humanitarian grounds." OSHINSKY, supra, at 52. Rather, small farmers wanted reform because "the forced labor of black prisoners had enriched a clique of arrogant planters and businessmen at the expense of everyone else. It had provided an unfair advantage to the people who deserved and needed it least." Id. A book on prisons published just three years before the adoption of our constitution states: "[T]he objection to convict labor, as now managed in most prisons, is that it is contracted out at such figures that the honest free laborers are reduced to starvation in the necessary competition *326 which ensues...." JOHN P. ALTGELD, OUR PENAL MACHINERY AND ITS VICTIMS 111 (1886). Clearly, concern over competition with free labor was the prevailing rationale at the time for prohibiting contracts with private industry for the labor of convicts.
Again, while the majority asserts that the delegates to Washington's constitutional convention were primarily concerned with "the extensive reputation for brutality, corruption, and ineffectiveness that the contract system of convict labor had in the Washington Territory and throughout the country," majority at 317, there is substantial evidence that a major concern at the convention was competition with free labor. First, at the convention, President John Hoyt presented a petition from the local labor union requesting that the following provision be included in the constitution: "Convict labor shall not be employed in competition with free labor." Suggestions from Tacoma, THE TACOMA DAILY LEDGER, July 18, 1889, at 4. Hoyt shared this request only weeks before the committee debated article II, section 29. Thus, the competition that convict labor would create with the private sector was undoubtedly in the forefront of the committee members' minds as they entered the debate for the convict labor provision.
The majority maintains that because this provision was not actually adopted, we cannot "give article II, section 29 the precise meaning the framers refused to adopt." Majority at 318. However, it is not surprising that the delegates rejected this provision in favor of the one actually adopted. Had the delegates adopted such a blanket prohibition, all prison labor would have been prohibited, as even state-run prison industries compete indirectly with free labor industries. See FARRELL, supra, at 30 (stating that when the State employs convict labor to manufacture goods for its own use, there is indirect competition with free labor). Thus, it is likely that the delegates rejected this provision because they wished to preserve the legislature's right to provide work for convicts "for the benefit of the state," rather than because they were not concerned about competition with free labor. Article II, section 29 represents a compromise between preventing competition and allowing convicts to work for the State's benefit, despite the resulting indirect competition.
Further evidence that competition was on the delegates' minds comes from an August 10, 1889, article in The Tacoma Daily Ledger, which carried the headline, "Delegates Oppose Leasing the Services of Criminals to Corporations." LEDGER, supra, Aug. 10, 1889, at 4. The article revealed the discomfort of some of the delegates with allowing convict labor to be utilized by private entities, while suggesting their relative support for using convict labor for public works. Referring to the committee members involved in the debate, the article stated, "Mr. Weir was opposed to leasing convict labor, or to bringing pauper labor in competition with honest workingmen." Id.; see also THE JOURNAL OF THE WASHINGTON STATE CONSTITUTIONAL CONVENTION: 1889, at 545 (Beverly Paulik Rosenow ed., 1999). T.M. Reed, another committee member, "thought convict labor was demoralizing to the laboring classes." LEDGER, supra, Aug. 10, 1889, at 4. In addition, "Mr. Prosser was also opposed to using convict labor." Id. Mr. Buchanan, meanwhile, "thought the convicts should be used on public works, and so did Mr. Lindsley." Id. Therefore, there was clearly a concern among the delegates about the issues of competition with free labor and the use of convict labor for nonpublic works.[6] At the end of the debate, both sections of the provision remained: one forbidding convict labor for private entities and the other mandating the use of convict labor for the benefit of the State.
In the years preceding the convention, the political life of our emerging state was dominated by the populist movement, which strongly influenced Washington's constitution. Hugh Spitzer, Washington Constitution's Suspicion of Big Business is Built-in, SEATTLE POST-INTELLIGENCER, Nov. 19, 1997, at A15. Although Washington's Populist Party *327 was not formalized until 1891, support for populist philosophies was strong throughout the 1880s. ROBERT F. UTTER & HUGH D. SPITZER, THE WASHINGTON STATE CONSTITUTION: A REFERENCE GUIDE 11 (2002). By 1889, "a wave of populism lapped against the shores of Olympia as the constitution was drafted." Southcenter Joint Venture v. Nat'l Democratic Policy Comm., 113 Wash.2d 413, 445, 780 P.2d 1282 (1989) (Utter, J., concurring).
Populism sprang primarily from agrarian roots and emphasized a philosophy of protection for small businesses and the working citizen. Id. Central among the populist ideals was the protection of the individual from unfair advantages created by coalitions between big government and politically connected big businesses. See generally James M. Dolliver, Condemnation, Credit, and Corporations in Washington: 100 Years of Judicial DecisionsHave the Framers' Views Been Followed?, 12 U. PUGET SOUND L.REV. 163 (1989). "The populists wished to protect personal, political, and economic rights from both the government and [big] corporations, and they strove to place strict limitations on the powers of both." Utter, supra, at 519. To achieve this, the populists strove to erect a "fire wall between the public and private sectors." Hugh Spitzer, Washington's Constitution and How It Affects Us, SEATTLE POST-INTELLIGENCER, Nov. 16, 1997, at E1. It was with this mindset that the framers drafted article II, section 29. Robert F. Utter, The Right to Speak, Write, and Publish Freely: State Constitutional Protection Against Private Abridgment, 8 U. PUGET SOUND L.REV. 157, 178 (1985).
As the focus of convict labor programs shifted from reformatory to economic, labor interests also exerted a powerful influence on the creation and amendment of State convict labor provisions. FARRELL, supra, at 98-99. The 1880s in Washington was a time of serious social upheaval, including labor unrest, as the railroad expansion led to rapid urbanization and a population explosion. UTTER & SPITZER, supra, at 11. After the railroad's completion, wide scale unemployment generated additional tensions. MARY W. AVERY, HISTORY AND GOVERNMENT OF THE STATE OF WASHINGTON 197 (1961). As a result, the Knights of Labor gained considerable local popular support, and its People's party won the Seattle mayoral election in 1886. Id. at 196. Serious clashes between private armies hired by mine owners and the mineworkers in the Cascade coal fields in the late 1880s ensured that labor issues influenced the debate at the constitutional convention. CARLOS A. SCHWANTES, RADICAL HERITAGE: LABOR, SOCIALISM, AND REFORM IN WASHINGTON AND BRITISH COLUMBIA, 1885-1917, at 32 (1979). Two members of the convention directly represented labor: Matt J. M'Elroy, a logger, and William L. Newton, a coal miner. Id. One historian credits the two prolabor provisionsarticle 29, section 2 and article 1, section 24 (forbidding corporations from employing armed bodies of men)directly to the labor influence on the delegates. Id.
Labor movement objections to convict labor existed at the national level as well. Although prison labor was heavily utilized throughout the nineteenth century, labor and business interests began to lobby against it in the 1880s and 1890s, claiming that "prison workers and the businesses that employed them had unfair advantages." Brian Hauck, Prison Labor, 37 HARV. J. ON LEGIS. 279, 281 (2000) (referencing Prison Industry Enhancement Certification Program Guidelines, 64 Fed.Reg. at 17,001); see also FARRELL, supra, at 98. Industry and an increasingly organized labor movement began to object to the sale of prison goods in the free market. FARRELL, supra, at 98. At its first convention, the National Labor Union, a precursor to the Knights of Labor, advocated for convict labor "`which will least conflict with honest industry outside the prisons.'" Id. During the mid-1880s and 1890s, the contract system of convict labor was abolished in several northern states. Id.; see also Blake McKelvey, The Prison Labor Problem: 1875-1900, 25 J.CRIM. L. & CRIMINOLOGY 254, 258 (1934). Thus, by the time the Washington State Constitutional Convention convened, the main function of prison labor had become economic and convict labor had become increasingly controversial, since it began to threaten both free laborers and manufacturers. FARRELL, supra, at 98.
*328 That the founders of our fledgling State were mindful of preventing competition with existing industry and free labor is also evident from the prison work programs implemented after the territorial government regained custody of its prisoners from private contractors immediately preceding the constitutional convention. The Washington Territory originally housed its prisoners in county jails. State Prison: A History of Adult Corrections in Washington, PERSPECTIVE, SpringSummer 1966, at 5 (hereinafter State Prison). However, the legislature soon recognized the need to provide a central facility and entered into a contract with William Billings, the sheriff of Thurston County, to take custody of all the convicts in one location. Id. at 6. Billings agreed to build a territorial prison in exchange for a maintenance allowance for each convict and the right to use their labor. Id. Under Billings' supervision, the convicts worked at logging, coal mining, and barrel-making. Id. at 7. This system proved to be quite profitable for Billings and his associates. Id. After 13 years, however, the government decided to abandon this "free enterprise" prison system and take over the supervision of prisoners itself. Id. The territorial government then built a new penitentiary in Walla Walla to be managed by the State. Id.; see also MESSAGES OF THE GOVERNORS OF THE TERRITORY OF WASHINGTON TO THE LEGISLATIVE ASSEMBLY, 1854-1889, at 250 (Charles M. Gates ed., 1940).
After the territorial government took over the care of its prisoners, prison officials continued to recognize the need for providing work for the convicts while also striving to prevent competition with free labor. Seeking to fulfill the goals of reducing idleness and assisting the prison financially, the prisoners at the Walla Walla penitentiary were first put to work making bricks. State Prison, supra, at 11. The commissioners later recommended expanding the prison's existing brick-making enterprise because, among other reasons, "no industry or institution would be materially injured thereby." The Walla Walla Prison: The Commissioners' Report to the Governor, THE TACOMA DAILY LEDGER, Nov. 27, 1889, at 2 (hereinafter Commissioners' Report). The prison also built a jute mill for the manufacture of burlap wheat bags upon the recommendation of the penitentiary's superintendent. Id. An 1887 report to the territorial governor by the superintendent discussed the need to provide work for the convicts in his care and suggested burlap bag manufacturing as an ideal industry because it "would in no [sic] come in compettiion [sic] with any local enterprise." WASHINGTON STATE PENITENTIARY, SUPERINTENDENT'S REPORT TO THE GOVERNOR AND LEGISLATIVE ASSEMBLY OF WASHINGTON TERRITORY 8 (Supp.1887). Furthermore, a letter from the commissioners of the Walla Walla penitentiary states that "we at once took into consideration the best means of employing the convicts to the benefit of the penitentiary, and at the same time not injure local industries." Commissioners' Report, supra, at 1. Thus, although territorial government officials recognized the need to provide some sort of work for convicts, they were also hesitant about providing any sort of work that might compete directly with free labor.
This examination of the historical period surrounding Washington's constitutional convention demonstrates that at both the State and national levels, competition with free labor was a prevailing concern.
C. Other States' Interpretations of Similar Constitutional Provisions: Because Washington courts have not previously interpreted article II, section 29,[7] it is appropriate to turn to other states with similar constitutional provisions for guidance. See Waremart, Inc. v. Progressive Campaigns, Inc., 139 Wash.2d 623, 638-39, 989 P.2d 524 (1999); see also Biggs v. Dep't of Ret. Sys., 28 Wash.App. 257, 259, 622 P.2d 1301 (1981).
(1) California: The California State Constitution provides that: "`The labor of convicts *329 shall not be let out by contract to any person, copartnership, company or corporation, and the Legislature shall, by law, provide for the working of convicts for the benefit of the State.'" Pitts v. Reagan, 14 Cal. App.3d 112, 115, 92 Cal.Rptr. 27 (1971) (quoting Cal. Const. art. X, § 1 (formerly art. X, § 6, repealed 1960)). That California's provision is nearly identical to Washington's article II, section 29 is not surprising.[8] California's constitutional convention was held only a decade prior to Washington's, in a similar political climate where a strikingly similar debate arose. See Pitts, 14 Cal.App.3d at 118, 92 Cal.Rptr. 27. For example, when a motion was made to strike the language, "`The labor of convicts shall not be let out by contract to any person, copartnership, company or corporation,'" several representatives spoke in favor of its retention. Id. at 118, 92 Cal.Rptr. 27. Comments such as the following were stated in favor of keeping the section: "`It is a burden upon free laborers for the State to contract the labor of these prisoners'"; "`a very great evil' is that `it brings this prison labor in competition with free white labor'"; and "`[t]he interests of the laboring classes are directly in conflict with the interest of those who employ contract labor.'" Id. at 118-19, 92 Cal.Rptr. 27 (quoting Delegates Condon, Freud, and Beerstecher). The comments from Washington delegates echoed these sentiments only 10 years later.[9] California's interpretation of its article X, section 1 is therefore instructive when interpreting our article II, section 29.
In Pitts, the California court of appeals interpreted the convict labor clause in its constitution in light of an "Emergency Harvest Program," under which convict labor was used for harvesting privately owned crops during periods of alleged labor shortages. 14 Cal.App.3d at 114-15, 92 Cal.Rptr. 27. In light of California's constitutional provision, the court of appeal held that the use of convict labor was prohibited in the case before it. The court concluded, "[T]he instant language of article X, section 1, is intended in the broader sensethat the state may not let out convict labor by contract to private employers regardless of whether the state or the convicts or both receive the attendant consideration." Id. at 117-18, 92 Cal.Rptr. 27. It did not matter to the court whether the convicts consented or that they were paid "going wages." Id. at 118, 92 Cal.Rptr. 27. Rather, the court was concerned with the competition with the private sector that the use of convict labor presented, stating:
Little imagination is required to visualize the effects of convicts in this manner competing in the state's labor market. And there would seem little doubt that the terse words of article X, section 1, "The labor of convicts shall not be let out by contract" to private persons were not intended to allow such a practice.
Id. at 118, 92 Cal.Rptr. 27.
The majority argues that the Pitts court invalidated the labor program at issue because there were no contracts between the growers and the prisoners, only between the growers and the State. Although the Pitts court noted that "[t]here were no individual contracts between the growers and the prisoners," id. at 116, 92 Cal.Rptr. 27, there is no indication that this was the basis for its holding. Furthermore, the majority implies that because the Pitts court stated that a "convict may himself sell or hire out his services to a private person," id. at 117, 92 Cal.Rptr. 27, the court would have validated our Class I industries. However, this ignores the critical distinction recognized by the Pitts court, which was that there was a contract between the State and private entities, just as there is in our Class I industries program. The court defined the issue before it as "whether the state, without profit or consideration to itself, is permitted by article X, section 1, to furnish convict labor to private individuals or organizations under contract or other agreement." Id. There is no indication in that statement that the court was particularly concerned with whether there were contracts between the convicts and the private enterprise.
*330 The facts of Pitts are quite similar to those before us. In both instances, prison labor is being utilized by a private industry by virtue of a contract with the State. Given the closeness in the timing of the adoption of our State's constitutions and the language of each provision, the California court's conclusion is persuasive in interpreting our own constitution and in an analysis of the driving concerns behind the respective provisions.[10]
(2) Illinois: A provision in the Illinois constitution also mirrors our own. Arthur S. Beardsley, Sources of the Washington State Constitution reprinted in 1987-88 WASHINGTON LEGISLATIVE MANUAL 376 (1987). Indeed, it is reported that Washington delegates were influenced by the Illinois constitution when modeling our own and when drafting the convict labor section in particular. Bond v. Burrows, 103 Wash.2d 153, 157-58, 690 P.2d 1168 (1984); JOURNAL OF THE WASHINGTON STATE CONSTITUTIONAL CONVENTION, supra, at 545 n. 53 (citing as similar Ill. Const. 1870 (Amendment of 1886)); Beardsley, supra, at 376.
The fourth amendment to the Illinois State Constitution states, "`Hereinafter it shall be unlawful for the commissioners of any penitentiary, or other reformatory institution in the State of Illinois, to let by contract to any person, or persons, or corporations, the labor of any convict confined within said institution.' "K. & S. Mfg. Co. v. Illinois, 7 Ill. Ct. Cl. 107, 1932 WL 2943, at *1 (1932) (quoting Ill. Const. (amend.4)). This amendment became effective in 1886 after organized labor staged a successful boycott of prison-made goods, thus echoing Washington's own labor influence during the time of its constitutional convention. See McKelvey, supra, at 256 n. 6.
When the fourth amendment to the Illinois Constitution was challenged, the state court of claims' response was direct. It stated, "The language of this provision is plain, and its purpose can not be misunderstood. It was intended to prevent prison labor from entering into competition with free labor." K. & S. Mfg., 1932 WL 2943, at *1. In K. & S., a manufacturing company sought damages from a contract with the department of public welfare for the manufacture of furniture at the Stateville prison. The court unequivocally recognized: "Any contract the effect of which is to let the labor of the prisoners is in violation of this clause of the Constitution and wholly void, and no cause of action can be based upon it." Id.
In 1903, Illinois enacted legislation that reflected the language of its constitution, but permitted prisoners to work under certain conditions. See id. at *2. Section 5 of the Illinois law provided that the board of prison industries,
"shall not ... make any contract by which the labor or time of any prisoner or convict in any penitentiary or reformatory of this State or the product or profit of his work shall be contracted, let, farmed out, given or sold to any person, firm, association or corporation; except that said prisoners or convicts in said penal or reformatory institutions may work for, and the products of their labor may be disposed of to the State, or for or to any public institution owned or managed and controlled by the State."
Id. (quoting Ill. Const. (amend.4)). This section resembles the "public benefit" clause of article II, section 29 of the Washington State Constitution and thus sheds additional light on the interpretation of our own provision.
Supplementing its interpretation of the fourth amendment, the Illinois court found the Illinois legislature's actions consistent with the constitution's goal of prohibiting prison labor from competing with the private market. The court said that the law "is in harmony with the letter and spirit of the fourth amendment to the Constitution." Id. Thus, convict labor could permissibly be used for the benefit of the State, so long as prison labor did not compete with the private market. The court stated, *331 It is clear ... that the intention of the legislature was to prevent the competition of prison labor with free labor; that it intended the prisoners should be employed in such work and in the manufacture of such articles as could be used by the State, the institutions of the State and the school and road districts of the State so that the products of their labor would not enter into [sic] goods sold on the open market to the general public.
Id. at *2. As with the Pitts case from California, the Illinois court's reasoning is persuasive in concluding that the Department's program, though legislatively authorized, violates the Washington State Constitution.
(3) Other States: The majority contends that Utah, New York, and Oklahoma courts have all rejected the proposition that their constitutional provisions preventing contracts for convict labor were intended to prevent competition with free labor. However, the cases cited by the majority all address programs or issues that are critically different from the case before us.
The majority first cites Utah Manufacturers Ass'n v. Mabey, 63 Utah 374, 226 P. 189 (1924), stating that "[t]he Utah Supreme Court clearly understood `contracting' to mean the contract system of convict labor." Majority at 318. In Utah Manufacturers, the court concluded that the program at issue did not have "any of the elements of `contracting convict labor,'" and therefore did not violate Utah's constitution. Id. at 189. However, the program in Utah Manufacturers was critically different from the one in the case at bar, as it was a state-run program that was controlled and supervised by state officials. Id. The court distinguished a case that had been decided the year before involving a convict work program in which a private company provided the materials, machinery, and supervision while the prison provided the labor of the convicts, the manufacturing space, and the utilities. Id. at 189-90 (discussing Price v. Mabey, 62 Utah 196, 218 P. 724 (1923)). The Price court invalidated the program, finding that it was "in its essence a contract for the hiring of prison labor." Price, 218 P. at 727. The Utah Manufactures court concluded that Price was not determinative in the case before it because the program in its case was state-run whereas the Price program "amounted to hiring convict labor to a corporation not under the control or management of the state or its officials." Utah Mfrs., 226 P. at 190. The Utah court clearly drew a distinction between permissible state-run labor programs and impermissible programs in which the State contracted out the labor of its convicts to private enterprises. The holdings in Utah Manufacturers and Price thus do not conflict with what I believe should be our holding today.
The majority also cites Rice v. State, 108 Okla. 4, 232 P. 807 (1924), which involved a shirt factory that was installed in the penitentiary and operated by the State. The State agreed to sell the shirts made by the inmates to a private enterprise. The majority maintains that the court rejected the argument that its constitution was meant to prevent competition between free labor and prison labor. However, as in Utah Manufacturers, this case concerned convict labor under the supervision and for the benefit of the State, not a private enterprise. In addition, the court was merely addressing whether convict-made goods could be sold on the open market even though they might compete indirectly with goods produced by free labor.[11] The Rice court found that state-run programs that produce goods for sale on the open market are constitutional, stating:
[I]t is necessary that those confined be employed.... The fact that such employment may produce a commodity to be sold on the market in competition with goods produced by free labor does not render the purpose a private one.
The state is entitled to the labor and service of its convicts while confined in its prisons, and has the authority to produce by such labor things of commercial value.
Id. at 810. The Rice court, however, did not find that all convict work programs, such as those in which convicts compete with free laborers for jobs, were permissible under its constitution.
Similarly, in People v. Hawkins, 157 N.Y. 1, 51 N.E. 257 (1898), the New York court of *332 appeals held that its constitution was not designed to suppress competition by forbidding the sale of prison-made goods to the general public. The majority characterizes the Hawkins court as rejecting the argument that its constitution was designed to suppress competition between prison laborers and free laborers. The issue in Hawkins, however, was not whether prisoners could work in private industry in competition with free workers, but rather whether convict-made goods could be sold to the public without being labeled as such. Hawkins, 51 N.E. at 258. As in Rice, the Hawkins court found that the State could not prohibit the sale of prison-made goods even though it might compete with goods made by free labor.
The majority thus mischaracterizes the holdings of these three cases, asserting that the courts found that their constitutions were not meant to protect free labor from competition with convict labor. In contrast, what these cases all stand for is that as long as a prison work program benefits the State and is state run, the various State constitutional provisions do not prevent the sale of the resulting prison-made goods, even though these goods inevitably compete on some level with goods made by free labor. The problem with the Class I industries program is that inmates work for a private enterprise in competition with free laborers and for the benefit of that enterprise in accordance with an agreement between the State and the enterprise. This issue was not raised by Utah Manufacturers, Hawkins, or Rice, and these cases are therefore of little value in answering the precise question before us.

III

CONCLUSION
The benefits of providing employment opportunities for convicts are not in dispute. Yet even if this court found Class I industries to be unconstitutional, there would remain four valid classes of inmate work programs under RCW 72.09.100(2)-(5),[12] as well as work release programs as established in chapter 72.65 RCW. The Class I industries program at issue in this case is different from these permissible programs because there is a contract between the private enterprise and the State for the benefit of the private enterprise.
I would hold that the "private sector partnership" formed between MicroJet and the Department, as permitted by RCW 72.09.100(1), is in direct conflict with article II, section 29 of the Washington State Constitution. Although I recognize the laudable public policy goals behind the legislation and the Department's actions in creating this program, I am compelled by the plain language of article II, section 29 and the historical context in which it was adopted to find it unconstitutional.
ALEXANDER, C.J., SANDERS, J., and SMITH J.P.T., concur.
NOTES
[1] In 1993, the Department of Corrections promulgated a "division directive" to detail implementation of the act. It is unclear if this document has been recently updated. It states in part:

The institution will post job descriptions, accept applications for employment and screen applicants for minimal qualification. The private sector partner will interview and select employees from the pool of pre-screened offenders. The private sector partner will employee selected offenders at a wage comparable to wages paid for work of a similar nature in the locality in which the partnership is located as verified by the Employment Security Department.
Offender employment in the private sector partnership shall be voluntary. Clerk's Papers (CP) at 92. Information before this court on how this program is actually implemented is scant and unnecessary for the resolution of the constitutional issue.
[2] For its historical facts and analysis, the petitioners rely heavily on an unpublished paper written by a law student for a state constitutional law class. The paper is rife with factual errors and unsupported conclusions.
[3] In 1881 there were 53 inmates at Seatco at an annual cost to the Territory of $24,002. By 1883, there were a reported 73 prisoners at a cost of $33,000, though inmate George France claimed that this figure included charges by the contractors of $1,533 for 6 nonexistent prisoners. Corcoran, supra, at 31. However, the biggest profit to the contractors was the free labor for their various enterprises. For example, the sash and door factory, manned completely with convict labor, was "`one of the largest sash and door factories on the coast at the time.'" Corcoran, supra, at 26 (quoting 2 William Prosser, Washington, West of the Cascades (1917)).
[4] George France spent seven years at Seatco and wrote a book about his experience. According to France, cruelty was common. He tells of one inmate who had nine of his teeth pulled by a guard after the inmate complained about conditions to visiting territorial authority. France, supra, at 282-84. The conditions were comparable to those of the Dark Ages. E.T. Short, After Many Years, Tacoma Times, Mar. 25, 1939.
[5] The Court of Claims is a department of the Illinois Secretary of State's office. The judges are appointed by the governor and confirmed by the Senate, and make recommendations to the General Assembly about whether to appropriate funds to pay claims. They also prepare and monitor federal grants to crime victims. It is not an appellate court. See http://www.sos.state.il.us/depts/claims/about.html (last visited Jan. 13, 2003).
[6] Illinois substantially revised its constitution in 1970, and this provision was abandoned. See Ill. Const. Prec. Preamble, Disp. Table.
[7] See, e.g., Idaho Const. art XIII, § 3 (1880) (requiring convict labor "be done within prison grounds, except where the work is done on public works under the direct control of the state"); Mont. Const. art. XVIII, § 2 (1889) (prohibiting "contracting of convict labor"); Utah Const. art. XVI, § 3 (1886) (prohibiting "contracting of convict labor").
[8] Interestingly, besides providing "social, moral, and physical" benefits to the convicts, it was hoped the jute manufactory would provide an additional "far-reaching benefit" of depressing the price of burlap bags for local farmers and preventing private burlap dealers from becoming too powerful in the local market. Supplementary Report of Prison Comm'rs, 5, 6 (Jan. 15, 1891). Thus, while the legislators avoided displacing local workers, they sought to be very competitive in the private market.
[9] The House Select Committee on Corrections stated that chapter 72.09 RCW was precipitated by the need to "insure that the tragedies of the 1970's and the lawsuits of 1980 do not continue into the future." Office of Prog. Research, An Overview, H.B. Rep. 235, at 1 (Wash. Mar. 2, 1981).
[10] RCW 72.09.100(1) provides that inmates who work at Class I industries "shall do so at their own choice." RCW 72.60.100 provides that inmates are employees of the industry, not agents or employees of the State.
[11] If plaintiffs believe that the wages being paid by MicroJet are below market, or that MicroJet is receiving advantages which create unfair competition, we urge plaintiffs to seek enforcement of the fair labor mechanisms in both the state and federal statutes.
[12] According to a study by the Maryland Division of Corrections comparing released inmates participating in prison industries with those who did not participate. Prison Industry Enhancement Program at http://wwwl. dpscs.state.md.us/doc/sui/pie.htm (last visited Jan. 14, 2003).
[13] Given our disposition, we do not reach the other issues raised by the parties regarding associational standing, the piercing of the corporate veil, and the proper subjects of a 42 U.S.C. § 1983 claim. Appellants' request for attorneys' fees is denied.
[14] While not an issue in this case, the Bureau of Justice Assistance has created a mechanism for internal agency review. See 64 Fed.Reg. at 17013.
[1] The "contract system of labor" refers to a nineteenth century system of convict labor under which there was a legal agreement between a private entity and prison officials for the labor of prison inmates for work performed within the prison. James J. Misrahi, Note, Factories with Fences: An Analysis of the Prison Industry Enhancement Certification Program in Historical Perspective, 33 AM.CRIM. L.REV. 411, 415 (1996). In contrast to the lease system that existed primarily in the South, the State retained responsibility for feeding, clothing, housing, and guarding the convicts under the contract system. WILLIAM J. FARRELL, PRISONS, WORK AND PUNISHMENT 28 (1994).
[2] "The secretary shall have the power and it shall be his duty to provide for the useful employment of prisoners in the adult correctional institutions: Provided, That no prisoners shall be employed in what is known as the contract system of labor." RCW 72.64.010.
[3] Two years prior, Congress had amended the Ashurst-Sumners Act, 18 U.S.C. § 1761, to allow for the interstate transport of goods made by prisoners in State institutions, provided certain criteria were met.
[4] CLASS I: FREE VENTURE INDUSTRIES. The industries in this class shall be operated and managed in total or in part by any profit or nonprofit organization pursuant to an agreement between the organization and the department. The organization shall produce goods or services for sale to both the public and private sector.

The department of corrections shall supply appropriate security and custody services without charge to the participating firms.
Inmates who work in free venture industries shall do so at their own choice. They shall be paid a wage not less than sixty percent of the approximate prevailing wage within the state for the occupation, as determined by the director of the institutional industries division. If the director finds that he cannot reasonably determine the wage, then the pay shall not be less than the federal minimum wage.
RCW 72.09.100(1).
The statute also establishes classes of inmate labor for "TAX REDUCTION INDUSTRIES," "INSTITUTIONAL SUPPORT INDUSTRIES," "COMMUNITY WORK INDUSTRIES," and "COMMUNITY SERVICE PROGRAMS." RCW 72.09.100(2), (3), (4), (5). These additional four classes are not before this court for consideration.
[5] Water jet cutting involves precision cutting of hard materials, such as steel and stone, by means of a jet of water borne abrasive material.
[6] There is, however, no record of any discussion by the committee members about the cruel or involuntary nature of the contract system. See THE JOURNAL OF THE WASHINGTON STATE CONSTITUTIONAL CONVENTION: 1889, AT 545 (Beverly Paulik Rosenow ed.,1999).
[7] A Washington attorney general did render an opinion in 1934, however. The attorney general was asked whether the State could agree to supply prison labor to a nursery, which would provide the State with plants and shrubs for an agreed upon value. Citing article II, section 29, the attorney general's office replied, "[A]ny arrangement whatever by which prisoners ... would perform labor for private interests, the state to receive something in return therefor, would be a violation of the above mentioned constitutional and statutory provisions." WASHINGTON ATTORNEY GENERAL OPINIONS 318 (1934).
[8] In addition to the parity in language, legal scholars have also recognized the influence California's constitution had in the formation of Washington's constitution. See Dolliver, supra, at 170 (citing Arthur S. Beardsley, Sources of the Washington State Constitution, reprinted in 1987-88 WASHINGTON LEGISLATIVE MANUAL 362 (1987)).
[9] See supra page 327.
[10] Indeed, the use of convict labor during labor shortages would arguably provide more of a state benefit than allowing a private industry to utilize a cheap prison workforce. Under the former program, the State would benefit because were it to forbid the farmers to utilize prison labor for harvesting, the crops might not be harvested and the income from selling the crops would not return to the State to enhance its economy. In contrast, the water jet industry is not short on labor. It would likely survive without prison labor as evidenced by the number of competitors in the field.
[11] See supra page 326.
[12] The four additional inmate work programs are Class II: Tax Reduction Industries, RCW 72.09.100(2); Class III: Institutional Support Industries, RCW 72.09.100(3); Class IV: Community Work Industries, RCW 72.09.100(4); Class V: Community Service Programs, RCW 72.09.100(5). All of these programs must be operated by or under the supervision of the Department and therefore do not run afoul of our constitution.