245 P.3d 766 (2010)
In the Matter of the Personal Restraint Petition of Jonathan Lee GENTRY, Petitioner.
No. 84039-3.
Supreme Court of Washington, En Banc.
December 30, 2010.
*767 Timothy Kent Ford, Rita Joan Griffith, Attorneys at Law, Seattle, WA, for Petitioner.
Paul Douglas Weisser, Sara J. DiVittorio, Office of the Attorney General, Olympia, WA, for Petitioner.
MADSEN, C.J.
¶ 1 Petitioner Jonathan Lee Gentry was sentenced to death and is currently residing in the intensive management unit (IMU) at the Washington State Penitentiary awaiting execution. Gentry challenges his current conditions of confinement as implemented by the Washington State Department of Corrections (DOC) in 2009, claiming he has been effectively placed in indefinite solitary confinement in violation of constitutional prohibitions against ex post facto punishment. Gentry requests an order releasing him from solitary confinement in the IMU. Alternatively, Gentry requests an evidentiary hearing. Because solitary confinement was contemplated by state law at the time of Gentry's crime and sentence, conditions of confinement in the IMU do not constitute ex post facto punishment. Finding no unlawful restraint, we dismiss this personal restraint petition (PRP).

FACTS
¶ 2 In 1991, Gentry was convicted of murder and sentenced to death. At that time, state law required all death row inmates to be housed in single cell units in the Washington State Penitentiary in Walla Walla. RCW 10.95.170. Under DOC regulations in effect at the time, all death row inmates were originally housed in the IMU of the penitentiary. Decl. of Timothy K. Ford (Ford Decl.), Ex. 1A. DOC regulations state that after 12 months in the IMU, inmates may receive a housing placement review. Id. Based on good behavior, Gentry was transferred to the special housing unit (SHU), where he enjoyed additional privileges, including daily contact with other inmates during out-of-cell leisure time, employment as a tier porter, and family contact visits. Decl. of Jonathan Gentry (Gentry Decl.) at 1.
¶ 3 In December 2008, Gentry was transferred back to the IMU, where he was again confined to a single cell for approximately 23 hours per day. PRP at 4; Gentry Decl. at 2-3. He had committed no infraction, but due to the state budget crisis, the SHU was being closed. Id.; Resp. of DOC at 3. Since that time, he has been housed in the IMU, where he has the opportunity to earn additional privileges (shower, property, library, and employment privileges) but is currently still subject to solitary confinement and is not permitted to work or to have contact visits with family. Decl. of Chistopher Bowman at 2-3; PRP at 4-5.
¶ 4 Gentry challenges the conditions of his confinement as an impermissible increase in the severity of his punishment, in violation of constitutional prohibitions on ex post facto laws. PRP at 5-6 (citing U.S. CONST. art. I, § 9; CONST. art. I, § 23). His PRP requests an order releasing him from solitary confinement in the IMU and reinstating the conditions of confinement he enjoyed at the SHU. PRP at 13. Alternatively, Gentry asks for an evidentiary hearing. Id.

*768 ANALYSIS
¶ 5 Generally, to obtain relief through a PRP, a petitioner raising an error of constitutional magnitude must make a threshold showing of actual and substantial prejudice, and a petitioner raising a nonconstitutional error must show the error "constitute[d] a fundamental defect and inherently result[ed] in a complete miscarriage of justice." In re Pers. Restraint of Lord, 123 Wash.2d 296, 303, 868 P.2d 835 (1994) (citing In re Pers. Restraint of Cook, 114 Wash.2d 802, 812, 792 P.2d 506 (1990)). However, where a PRP raises issues that were afforded no previous opportunity for judicial review, such as constitutional challenges to actions taken by prison officials, the petitioner need not make the threshold showing of actual prejudice or complete miscarriage of justice. In re Pers. Restraint of Grantham, 168 Wash.2d 204, 214, 227 P.3d 285 (2010) (citing In re Pers. Restraint of Isadore, 151 Wash.2d 294, 299, 88 P.3d 390 (2004)). Instead, the petitioner need only show he is unlawfully restrained under RAP 16.4. Isadore, 151 Wash.2d at 299, 88 P.3d 390; Grantham, 168 Wash.2d at 211, 227 P.3d 285 (PRP may raise state law or constitutional challenge to "conditions or manner of restraint" under RAP 16.4(c)(6)).
¶ 6 Mr. Gentry does not challenge his conviction or general confinement to prison as unlawful. Instead, he claims that his removal from the SHU and placement in the IMU has subjected him to more restrictive conditions of confinement in violation of the prohibition on ex post facto punishment. Gentry's claim presupposes a liberty interest in residing in the SHU or in retaining the privileges afforded there.
¶ 7 The Washington and United States Constitutions do not create a liberty interest in a particular form of prison housing, absent allegations of cruel and unusual punishment in violation of the Eighth Amendment, which Gentry does not assert. However, the State can create a liberty interest through statute or regulation. When a liberty interest is created through regulation, an inmate can demonstrate an unlawful restraint where "the action taken ... [is] an atypical and significant deprivation from the normal incidents of prison life." In re Pers. Restraint of Dyer, 143 Wash.2d 384, 392-93, 20 P.3d 907 (2001) (citing Sandin v. Conner, 515 U.S. 472, 484, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995)).
¶ 8 In In re Medley, 134 U.S. 160, 10 S.Ct. 384, 33 L.Ed. 835 (1890), the Supreme Court struck down a Colorado statute mandating solitary confinement for death row inmates. The Court observed that "[s]olitary confinement was neither authorized by the former statute, nor was its practice in use in regard to prisoners awaiting the punishment of death." Id. at 167, 10 S.Ct. 384. Since solitary confinement was not contemplated at the time of the crime or sentence, imposition of such confinement constitutes "an atypical and significant deprivation from the normal incidents of prison life." Dyer, 143 Wash.2d at 393, 20 P.3d 907.
¶ 9 In contrast to Colorado statutes, Washington statutes and DOC regulations in effect at the time of Gentry's crime and sentence provide that death row inmates are initially placed in the IMU and remain there for at least one year. Ford Decl., Ex. 1A. Subsequent transfer to SHU, with its attendant privileges, is dependent upon inmate conduct. Thus, conditions of confinement present in the IMU, even if a "hardship," are not "an atypical and significant deprivation from the normal incidents of prison life" but are within the range of conditions contemplated by the terms of the prisoner's confinement at the time of sentencing. Dyer, 143 Wash.2d at 393, 20 P.3d 907 (citing Sandin, 515 U.S. at 484, 115 S.Ct. 2293).
¶ 10 As this court has observed, housing in the SHU is a privilege, which the DOC can allocate for any number of administrative reasons, including safety concerns, staffing constraints, or budget crises. Id. at 396-97, 20 P.3d 907. The fact that a death row inmate may be assigned to the SHU with its attendant conditions is not sufficient to create a liberty interest in the continuation of those conditions.
¶ 11 Mr. Gentry argues, however, that the good time credit he earned, which allowed him to live in the SHU, is a liberty interest that cannot be taken away through ex post *769 facto changes in regulation. He claims that "[u]nder the law and DOC policy in effect at the time of his alleged crime and sentencing, Petitioner had the right to human contact so long as he maintained good behavior." Pet'r's Reply to Resp. of DOC to PRP at 3 (emphasis added).
¶ 12 Mr. Gentry is incorrect. Inmates could be denied SHU housing or returned to IMU housing for protection or administrative reasons. In procedure B.1.f. of the regulations, the housing placement committee considers the "degree of security and supervision required," which could include the need to protect the inmate. Ford Decl., Ex. 1D. Additionally, DOC regulations provide two reasons for returning inmates to the IMU under procedure D: (1) disciplinary infraction or (2) administrative reasons such as "inmate's stay is lifted" or "inmate must be transported." Id.; RCW 72.02.210, .230,.240.
¶ 13 Moreover, this court has previously held that a prisoner's participation in good behavior incentive programs, which confer benefits over which the DOC has discretion, can be discontinued by ex post facto changes to prison regulations for valid administrative reasons having nothing to do with an individual prisoner's conduct. Dyer, 143 Wash.2d at 396-97, 20 P.3d 907. In Dyer, this court found no unlawful restraint when a prisoner's participation in a benefits program awarding extended family visitations was discontinued. Id. at 387-89, 20 P.3d 907. The prisoner had committed no violation, but no longer qualified for participation in the program after the legislature passed new regulations prohibiting participation by inmates with a documented record of domestic violence. Id. This court held that the extended family visit program did not constitute a state-created liberty interest, and the privilege of previous participation did not create a "legitimate claim of entitlement" to future participation where the petitioner did not qualify under the new regulation. Id. at 392-94, 20 P.3d 907 (citing Sandin, 515 U.S. at 484, 115 S.Ct. 2293).
¶ 14 Dyer relied heavily on Sandin, in which the United States Supreme Court compared inmates segregated for totally discretionary administrative or protection reasons to those segregated for disciplinary purposes and found the two groups experience very similar conditions. Sandin, 515 U.S. at 486, 115 S.Ct. 2293. This similarity showed that the conditions experienced by inmates in disciplinary segregation were within the range of conditions contemplated by the terms of the original sentence. Id. Accordingly, the Court held there was no liberty interest in being free from placement in segregation due to disciplinary action. Id.
¶ 15 As in Dyer and Sandin, Gentry's claim that he "had the right to human contact" under prior DOC regulations "so long as he maintained good behavior" is not correct because DOC has been given broad discretion over conditions of inmate housing. As in Dyer and Sandin, DOC regulations created no legitimate claim to future entitlement or liberty interest in SHU conditions. We find that altering the conditions of Mr. Gentry's confinement under the circumstances presented here does not violate the constitutional prohibition against ex post facto punishment, and therefore, Mr. Gentry is not under unlawful restraint.

CONCLUSION
¶ 16 Because solitary confinement was contemplated by state law at the time of Gentry's crime and sentence, and because participation in a good behavior incentive program does not create a liberty interest in special housing and related privileges, Mr. Gentry has failed to show that he is unlawfully restrained under RAP 16.4. Accordingly, we dismiss this PRP and deny the request for evidentiary hearing.
WE CONCUR: CHARLES W. JOHNSON, GERRY L. ALEXANDER, TOM CHAMBERS, SUSAN OWENS, MARY E. FAIRHURST, and JAMES M. JOHNSON, Justices.
STEPHENS J. (dissenting).
¶ 17 I dissent because we do not have enough information to resolve Jonathan Gentry's claim at this early stage. I would remand this case to a superior court for a reference hearing to make determinations as *770 to several factual questions that are unanswered here.
¶ 18 The majority fails to see the relevance of the facts missing here because it mischaracterizes Gentry's argument. He is not claiming that he has a liberty interest in housing conditions or a particular housing unit in the Washington State Penitentiary (WSP). In fact, neither he nor the Department of Corrections (DOC) even mentions the analysis from Sandin v. Conner, 515 U.S. 472, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995), that features so prominently in the majority opinion. Majority at 768-69. Instead, Gentry's claim is that his present custody of indefinite solitary confinement, without the opportunity for human contact with other inmates and visitors, constitutes an ex post facto punishment. The majority opinion indicates that solitary confinement is synonymous with the intensive management unit (IMU) and thus reasons that the housing unit in which Gentry is now confined and the unit in which he was confined upon his initial entry into prison are essentially the same. Id. at 768-69. But, we do not know this from the DOC literature cited by the majority. There is no question that the IMU was and is more restrictive than the special housing unit (SHU) that was closed in 2009, prompting this personal restraint petition. There is no question that placement in the IMU has always involved single-person cells. RCW 10.95.170. But, the argument is that the custody situation for death row inmates today is entirely new because it eliminates the structured system that accompanied the former IMU placement, which offered the opportunity for interaction on a daily basis and contact visits with family members.
¶ 19 Gentry relies on In re Medley, 134 U.S. 160, 10 S.Ct. 384, 33 L.Ed. 835 (1890), to argue that his confinement is unconstitutional. In Medley, the United States Supreme Court found an ex post facto violation when, after a prisoner was sentenced to death, a Colorado law was passed mandating solitary confinement for death row prisoners until execution. Id. at 171, 10 S.Ct. 384.
¶ 20 Whether Gentry is entitled to relief under Medley and the ex post facto clause depends on how his confinement is properly understood. As noted, the only statutory requirement is that death row inmates be placed in single cells in the segregation unit of WSP. RCW 10.95.170. At the time Gentry was convicted, sentenced, and incarcerated, DOC rules pursuant to this statute required a death row inmate to be housed in the IMU for one year, at which time he could "graduate" to the less-restrictive SHU if his disciplinary record was satisfactory. Pet. at 3. Thus, on one hand, IMU inmates once had the opportunity to graduate to the SHU on good behavior. Now, it appears IMU inmates are denied the graduation option, which is akin to the situation the United States Supreme Court invalidated in Medley, 134 U.S. at 164, 10 S.Ct. 384. On the other hand, it could be argued that the petitioner's current IMU confinement is not any more restrictive than his initial confinement because he was first placed in the IMU. In fact, now he is at level five in the IMU, which comes with more privileges than other IMU residents enjoy and is less restrictive than Gentry's initial placement in the IMU when his incarceration began. This is the characterization the majority favors. Majority at 769.
¶ 21 But of the two possible characterizations, the first seems most consistent with Medley. The conditions at initial confinement must be reviewed in toto. At the time of his crime and sentence, Gentry was not confined in the IMU permanently, as now, but rather the initial IMU placement included the promise of graduating to the SHU upon good behavior. Indeed, Gentry argues the current confinement is worse than in Medley because death row inmates in the IMU are denied family contact visits, which were allowed under the terms of confinement at issue in Medley, 134 U.S. at 164, 10 S.Ct. 384. The majority notes that the ex post facto loss of "good behavior incentive programs" is permissible if justified by "valid administrative reasons." Majority at 769 (citing In re Pers. Restraint of Dyer, 143 Wash.2d 384, 396-97, 20 P.3d 907 (2001)). But, a record of those valid administrative reasons is exactly what we lack here. The State claims that the closure of the SHU was prompted by budget cuts, which is arguably *771 a valid administrative reason. However, budget cuts do not necessarily explain why the graduated system of prisoner benefits, most notably contact visits with family, had to be cut as well.
¶ 22 In sum, Gentry raises a significant question as to whether there is an ex post facto violation here. This question apparently affects all death row inmates. But, it is not clear what constitutional limits exist on DOC's ability to modify terms of confinement without violating the prohibition on ex post facto punishments. It is necessary to have a more complete factual record as to DOC's policies regarding conditions of confinement as they presently exist and as they existed at the time of Gentry's crime and sentence. Gentry recognizes as much when he asks, in the alternative, that we refer this matter to a superior court judge to resolve any disputed issues of fact. Pet. at 13. RAP 16.12 allows us to order such a hearing. I would therefore order a reference hearing and in doing so, grant Gentry's request to proceed in forma pauperis and his request for appointment of counsel.
I CONCUR: RICHARD B. SANDERS, Justice.