**NOTICE:   SLIP OPINION**
**(not the court's final written decision)**

The opinion that begins on the next page is a slip opinion.  Slip opinions are the written opinions that are originally filed by the court.

A slip opinion is not necessarily the court's final written decision.  Slip opinions can be changed by subsequent court orders.  For example, a court may issue an order making substantive changes to a slip opinion or publishing for precedential purposes a previously "unpublished" opinion.  Additionally, nonsubstantive edits (for style, grammar, citation, format, punctuation, etc.) are made before the opinions that have precedential value are published in the official reports of court decisions: the Washington Reports 2d and the Washington Appellate Reports.  An opinion in the official reports replaces the slip opinion as the official opinion of the court.

**The slip opinion that begins on the next page is for a published opinion, and it has since been revised for publication in the printed official reports.**  The official text of the court's opinion is found in the advance sheets and the bound volumes of the official reports.  Also, an electronic version (intended to mirror the language found in the official reports) of the revised opinion can be found, free of charge, at this website: https://www.lexisnexis.com/clients/wareports.

For more information about precedential (published) opinions, nonprecedential (unpublished) opinions, slip opinions, and the official reports, see https://www.courts.wa.gov/opinions and the information that is linked there.

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

FILE

IN CLERK'S OFFICE
SUPREME COURT, STATE OF WASHINGTON
OCTOBER 7, 2021

*González, C.J.*
CHIEF JUSTICE

THIS OPINION WAS FILED
FOR RECORD AT 8 A.M. ON
OCTOBER 7, 2021

ERIN L. LENNON
SUPREME COURT CLERK

# IN THE SUPREME COURT OF THE STATE OF WASHINGTON

|  |  |  |
|---|---|---|
| In the Matter of the Personal Restraint Petition of | ) ) ) | No. 99344-1 |
| ROBERT RUFUS WILLIAMS, | ) ) | En Banc |
| Petitioner. | ) ) ) | Filed: October 7, 2021 |

MADSEN, J.—In the midst of the global COVID-19 (coronavirus 2019) pandemic, Robert Rufus Williams filed a personal restraint petition (PRP) arguing that the conditions of his confinement constitute cruel punishment in violation of the state and federal constitutions. *See* WASH. CONST. art. I, § 14; U.S. CONST. amend. VIII. While confined in Department of Corrections (DOC) facilities, Williams asked this court to order his sentence be served in home confinement at his sister's home in Florida until COVID-19 no longer posed a threat to him.

After hearing oral arguments, we issued an order recognizing that article I, section 14 of the Washington Constitution is more protective than the Eighth Amendment to the

No. 99344-1

United States Constitution regarding conditions of confinement and that Williams's then current conditions of confinement were cruel under the state constitution: specifically, the lack of reasonable access to bathroom facilities and running water, as well as DOC's failure to provide Williams with appropriate assistance in light of his physical disabilities. We granted Williams's PRP and directed DOC to remedy those conditions or to release Williams.

DOC later reported that it had complied with this court's order and had placed Williams in a housing unit designed for assisted living care. Williams was relocated to a single cell with no roommates and a toilet and sink, and was given access to Americans with Disabilities Act (ADA) compliant restrooms and a readily available medical staff, an assigned wheelchair pusher/therapy aide, and an emergency pendant allowing him to call for assistance. We concluded that these actions remedied the unconstitutional conditions and declined to order Williams's release.

Today, we explain the reasoning underlying our order granting Williams's PRP. We hold that the Washington Constitution is more protective than the federal constitution in the context of prison conditions and accordingly announce a test to analyze conditions of confinement that provides the protection required by article I, section 14. Under this test, the conditions of Williams's incarceration violated our state's cruel punishment clause because those conditions exposed Williams to a significant risk of serious harm by depriving him basic hygienic necessities and those conditions were not sufficiently related to any legitimate penological interest.

2

No. 99344-1

## BACKGROUND

In 2009, Williams was convicted of multiple offenses, including the brutal assault of his ex-girlfriend. *State v. Williams*, noted at 160 Wn. App. 1036, 2011 WL 1004554, at *1-3. Williams was sentenced to 22.5 years of confinement. *See id.* at *3. The Court of Appeals affirmed his conviction in 2011. *Id*. at *5.

In late December 2019, COVID-19 swept across the globe. An airborne virus transmitted through inhaling infected aerosol droplets, COVID-19 is especially dangerous for individuals over the age of 65 and those with preexisting medical conditions, and it has severely affected communities of color. *Risk for COVID-19 Infection, Hospitalization, and Death by Race/Ethnicity*, CTRS. FOR DISEASE CONTROL AND PREVENTION (updated Sept. 9, 2021), https://www.cdc.gov/coronavirus/2019-ncov/covid-data/investigations-discovery/hospitalization-death-by-race-ethnicity.html [https://perma.cc/J39U-6HDA]; *The COVID Racial Data Tracker*, THE COVID TRACKING PROJECT AT THE ATLANTIC, https://covidtracking.com/race [https://perma.cc/9SMQ-MFST]. Transmission of COVID-19 is particularly concerning in the correctional setting due to the close quarters in which inmates live, the crowding, and the recirculated air. *See Colvin v. Inslee*, 195 Wn.2d 879, 886, 467 P.3d 953 (2020) ("Prisons are not designed to easily accommodate social distancing."); *Ahlman v. Barnes*, 445 F. Supp. 3d 671, 679 (C.D. Cal. 2020) ("COVID-19 is particularly dangerous in jails and prisons, where inmates are often unable to practice the recommended social

3

No. 99344-1

distancing, lack access to basic hygienic necessities, and are regularly exposed to correctional officers and staff who move in and out of the Jail.").

DOC has taken numerous steps to stem the spread of COVID-19 within its 12 prisons. These steps include

- Implementing screening, testing, and infection control guidelines that are continuously updated;
- Employing an infectious disease physician to manage DOC's infection prevention program;
- Employing specialized infection prevention nurses at major prison facilities;
- Daily staff screening and contact tracing;
- Screening and quarantining newly admitted inmates;
- Screening and isolating (when required) inmates transported between facilities;
- Instituting protocols to limit the volume of inmate transfers;
- Reducing the number of incarcerated individuals;
- Implementing an "intensive cleaning protocol" for high touch surfaces;
- Providing inmates with two bars of soap at no cost, ongoing free soap during the pandemic, and hand sanitizer in certain areas, and using inmates to assist with cleaning efforts;
- Implementing physical distancing through room occupancy limits, reducing programming and inmates in the outside yards, staggering medication lines, closing weight lifting areas, and adjusting religious services;
- Quarantining, isolating, and testing suspected or confirmed COVID-19 inmates;
- Providing bandana face coverings to inmates, and in some instances providing and requiring fit-tested N95 masks;
- Suspending visitation and volunteer programs at all DOC facilities; and
- Undertaking an incremental approach to resuming normal operations.

DOC Mot. to Suppl., Ex. 1, para. 4 (Second Decl. of Scott Russell) (Wash. Ct. App. No. 54629-9-II (2020)); *see generally* DOC's Resp., Ex. 2 (Decl. of Julie Martin) (Wash. Ct. App. No. 54629-9-II (2020)) (detailing DOC's ongoing efforts to reduce the spread of COVID-19 within its facilities).

4

No. 99344-1

During the initial stage of the pandemic, Williams was 77 years old and incarcerated at Coyote Ridge Corrections Center. Williams, a Black man, suffered from diabetes and hypertension. Years earlier, Williams had experienced a massive stroke that immobilized the right side of his body and required him to use a wheelchair. Williams relied on therapy aides to push his wheelchair and assist him with daily tasks.

At Coyote Ridge, Williams shared a cell with three other inmates. Because that cell was dry—lacking a sink or toilet—Williams had to wait for prison staff to unlock his cell and move him to an accessible bathroom facility equipped to accommodate his needs. Williams often waited long periods of time for assistance to the bathroom. As a result, he was forced to relieve himself in bottles and was unable to keep himself clean.

In April 2020, Williams sought an extraordinary medical placement with his sister in Florida. DOC denied the request, determining that Williams failed to satisfy the requisite community safety criteria. A week later, Coyote Ridge reported its first case of COVID-19 within the prison population.

On May 15, 2020, Williams petitioned for relief from unlawful restraint in this court. Williams argued that his conditions of confinement were cruel punishment in violation of article I, section 14 of the Washington State Constitution and the Eighth Amendment to the United States Constitution. He asked us to order his immediate release to live with his sister in Florida. We transferred the PRP to the Court of Appeals for consideration.

No. 99344-1

While his case was pending before the Court of Appeals, Williams tested positive for COVID-19. After hospitalization, Williams was discharged to the Airway Heights Corrections Center infirmary and eventually transferred back to Coyote Ridge. He soon reported feeling chest pain, shortness of breath, and fatigue; Williams was returned to his cell. A few weeks later, Williams was taken to a local emergency department with similar symptoms. He tested negative for COVID-19 and again was discharged to Coyote Ridge's infirmary for observation and then to a cell.

In December 2020, the Court of Appeals issued its opinion on Williams's PRP. The court concluded that the Washington Constitution is more protective than the federal constitution regarding prison conditions and crafted a test to evaluate state constitutional challenges. *In re Pers. Restraint of Williams*, 15 Wn. App. 2d 647, 665-71, 476 P.3d 1064 (2020). The court's test reviewed three factors: national consensus on release eligibility, severity of the risk faced by the petitioner, and penological justifications for continued incarceration. *Id*. at 672-82. The court concluded both that Williams did not satisfy its test and that he failed to show his conditions were cruel under the Eighth Amendment. *Id*. at 682-86. Thus, the Court of Appeals denied Williams's PRP, motion for release, and request for a reference hearing. *Id*. at 686.

Williams sought accelerated discretionary review here, which our commissioner granted. Ruling Granting Review, No. 99344-1, at 4-5 (Wash. Feb. 3, 2021). Williams asserted that the surge of COVID-19 throughout DOC facilities showed that DOC was incapable of controlling the outbreak; he also proposed a test for reviewing challenges to

6

No. 99344-1

prison conditions that would require the State to establish the penological justifications for ongoing confinement in light of "new objective data" showing a punishment's disparate impact on individuals based on race, age, or disability. Pet'r's Suppl. Br. at 10-12; Pet'r's Mot. for Discr. Review at 3-4. As a "severely disabled Black man with advanced diabetes and hypertension," Williams argued that his confinement during the COVID-19 pandemic was cruel. Pet'r's Suppl. Br. at 11.[1]

After oral arguments, we agreed with Williams, in part. We concluded his conditions of confinement—specifically the lack of reasonable access to bathroom facilities and running water, as well as DOC's failure to provide Williams with appropriate assistance in light of his disabilities—constituted cruel punishment pursuant to article I, section 14 of our state constitution. We therefore granted Williams's PRP and directed DOC to remedy the cruel conditions, either at Coyote Ridge or an alternative placement, or to release Williams. DOC has remedied the unconstitutional conditions of confinement at Coyote Ridge, where Williams remains as of this writing. The following explains our reasons for agreeing with Williams that the challenged conditions of confinement constituted cruel punishment under article I, section 14 of the Washington State Constitution.

---

[1] On March 9, 2021, Williams moved to supplement the record regarding disputed disciplinary infractions while in DOC custody. Williams argued that the interactions were not relevant to his claims of constitutional conditions of confinement but were referenced by DOC in its briefing to this court. We agree with Williams—the interactions are not relevant to our decision on the unconstitutional prison conditions in which Williams was confined. Accordingly, we deny the motion to supplement.

7

No. 99344-1

ANALYSIS

To obtain relief through a PRP, petitioners challenging the conditions of their confinement must show they are being unlawfully restrained under RAP 16.4 *In re Pers. Restraint of Gentry*, 170 Wn.2d 711, 715, 245 P.3d 766 (2010). No party disputes Williams is under DOC restraint. Thus, the issue is whether that restraint is unlawful. Unlawful restraint occurs when the conditions or manner of the restraint are "in violation of the Constitution of the United States or the Constitution or laws of the State of Washington." RAP 16.4(c)(6).

Petitioners bear the burden of proving unlawful restraint by a preponderance of evidence. *In re Pers. Restraint of Cook*, 114 Wn.2d 802, 813-14, 792 P.2d 506 (1990). Factual evidence, rather than conclusory allegations, must be offered in support of a PRP. *In re Pers. Restraint of Gronquist*, 138 Wn.2d 388, 396, 978 P.2d 1083 (1999). Speculation, conjecture, and inadmissible hearsay is insufficient to warrant relief. *Id*. To obtain relief from a PRP based on a constitutional error, a petitioner must show two things: (1) a constitutional error occurred and (2) the error resulted in actual and substantial prejudice. *See Cook*, 114 Wn.2d at 809-10. However, where a petitioner raises a claim for which there was "no previous opportunity for judicial review, such as constitutional challenges to actions taken by prison officials," a petitioner is not required to make a threshold showing of prejudice. *Gentry*, 170 Wn.2d at 714-15. Rather, the petitioner must show the conditions or manner of restraint violate state law or the constitution. *Id*. at 715.

8

No. 99344-1

I. Article I, Section 14

Williams argues the conditions of his confinement are unconstitutional under both state and federal constitutions. Where feasible, it is this court's duty to resolve constitutional questions first under our own state constitution before turning to federal law. *O'Day v. King County*, 109 Wn.2d 796, 801-02, 749 P.2d 142 (1988) (citing *State v. Coe*, 101 Wn.2d 364, 373-74, 679 P.2d 353 (1984)). "We do so because in addition to our responsibility to interpret Washington's constitution, we must furnish a rational basis 'for counsel to predict the future course of state decisional law.'" *Collier v. City of Tacoma*, 121 Wn.2d 737, 745-46, 854 P.2d 1046 (1993) (quoting *State v. Gunwall*, 106 Wn.2d 54, 60, 720 P.2d 808 (1986)).

Article I, section 14 proscribes both disproportionate sentencing and "certain modes of punishment." *State v. Manussier*, 129 Wn.2d 652, 676, 921 P.2d 473 (1996) (citing *State v. Fain*, 94 Wn.2d 387, 395-96, 617 P.2d 720 (1980)). We have recognized that the state provision is more protective than its federal counterpart. *See, e.g.*, *State v. Bassett*, 192 Wn.2d 67, 78 & n.2, 428 P.3d 343 (2018). However, this conclusion has arisen mainly in the context of disproportionate sentencing. *Id.*; *Fain*, 94 Wn.2d at 402. Because the current case concerns prison conditions, we first consider whether article I, section 14 is more protective in this context. *State v. Ramos*, 187 Wn.2d 420, 454, 387 P.3d 650 ("Even where it is already established that the Washington Constitution may provide enhanced protections on a general topic, parties are still required to explain why

9

No. 99344-1

enhanced protections are appropriate in specific applications."), *cert. denied*, 138 S. Ct. 467 (2017).

Our analysis of the protections provided by our state constitution is guided by *Gunwall*'s six nonexclusive factors: (1) the textual language of the state constitution, (2) differences in the texts of parallel provisions of the federal and state constitutions, (3) state constitutional and common law history, (4) preexisting state law, (5) structural differences between the federal and state constitutions, and (6) matters of particular state interest or local concern. 106 Wn.2d at 61-62. In some instances, our state constitution provides greater protections than the federal constitution. *State v. Young*, 123 Wn.2d 173, 179, 867 P.2d 593 (1994) (citing *State v. White*, 97 Wn.2d 92, 108-09, 640 P.2d 1061 (1982)).

Analyzing the first three factors leads us to conclude that Washington's ban on cruel punishment in the context of confinement conditions is more protective than the Eighth Amendment. The text of article I, section 14 provides, "Excessive bail shall not be required, excessive fines imposed, nor cruel punishment inflicted." WASH. CONST. art. I, § 14. This is similar to but distinct from the Eighth Amendment, which states that "[e]xcessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." U.S. CONST. amend. VIII. Washington's provision omits the words "and unusual," prohibiting punishments that are cruel without the additional requirements that they also be unusual. One delegate at Washington's constitutional convention moved to include "unusual," but the amendment was not

10

No. 99344-1

adopted because framers of article I, section 14 found the term "cruel" sufficiently expressed their intent. THE JOURNAL OF THE WASHINGTON STATE CONSTITUTIONAL CONVENTION: 1889, at 501-02 (Beverly Paulik Rosenow ed. 1962). In at least two cases, this court has held that the difference in language—article I, section 14's omission of the federal constitution's "unusual" requirement—is material and supports a more expansive interpretation.[2] *Bassett*, 192 Wn.2d at 80; *Fain*, 94 Wn.2d at 392-93.

The historical context of Washington's constitution also supports a more protective interpretation. *See Yelle v. Bishop*, 55 Wn.2d 286, 291, 347 P.2d 1081 (1959) ("In determining the meaning of a constitutional provision, the intent of the framers, and the history of events and proceedings contemporaneous with its adoption may properly be considered."). In addition to article I, section 14's ban on cruel punishment, Washington's founders included a ban on certain convict labor systems in article II, section 29, which bears on the conditions of a prisoner's confinement.[3] At the time of

---

[2] We note, however, that in the Supreme Court's jurisprudence the term "unusual" has not been analyzed independently of the term "cruel." *Solem v. Helm*, 463 U.S. 277, 284, 103 S. Ct. 3001, 77 L. Ed. 2d 637 (1983) (stating the Eighth Amendment prohibits "barbaric punishments" and punishments "disproportionate to the crime committed"); *Harmelin v. Michigan*, 501 U.S. 957, 967, 111 S. Ct. 2680, 115 L. Ed. 2d 836 (1991) (plurality portion) (stating that "textual[ly]" the Eighth Amendment precludes punishments that are both cruel and unusual); *see also* Meghan J. Ryan, *Does the Eighth Amendment Punishments Clause Prohibit Only Punishments That Are Both Cruel* and *Unusual?*, 87 WASH. U. L. REV. 567, 569 (2010).

[3] The provision states,

> The labor of inmates of this state shall not be let out by contract to any person, copartnership, company, or corporation, except as provided by statute, and the legislature shall by law provide for the working of inmates for the benefit of the state, including the working of inmates in state-run inmate labor programs. Inmate labor programs provided by statute that are operated and managed, in total or in part, by any profit or nonprofit entities shall be operated so that the programs do not unfairly compete with Washington businesses as determined by law.

WASH. CONST. art. II, § 29.

11

No. 99344-1

Washington's constitutional convention, prison labor generally operated under a private or public system. *Wash. Water Jet Workers Ass'n v. Yarbrough*, 151 Wn.2d 470, 477-78, 90 P.3d 42 (2004) (citing WILLIAM J. FARRELL, PRISONS, WORK AND PUNISHMENT 30 (1994); CHARLES P. NEILL, TWENTIETH ANNUAL REPORT OF THE COMMISSIONER OF LABOR, CONVICT LABOR 40-41 (1905)). Both systems were characterized by cruel conditions and harsh treatment of prisoners. *See* Stephen P. Garvey, *Freeing Prisoner's Labor*, 50 STAN. L. REV. 339, 351 (1998). In the private system, convict leasing allowed states to contract with private lessees who would manage prisoners and generally subjected them to "'unspeakable brutality.'" *Wash. Water Jet Workers*, 151 Wn.2d at 478 (quoting Garvey, *supra*, at 357).

The prestatehood prison system in Washington used private contract leasing and was, unsurprisingly, cruel. *See id*. at 489-90. In 1877, Washington lawmakers contracted with local sheriffs to build and operate the first territorial prison. *Id*.; PAUL W. KEVE, THE MCNEIL CENTURY: THE LIFE AND TIMES OF AN ISLAND PRISON 49-50 (1984). Located in Seatco (modern day Bucoda), the prison generated accounts of "heavy punishment, inhumane living conditions, and indifference to health needs." KEVE, *supra*, at 51. In lieu of guards, prisoners wore padded leg irons that weighed close to 20 pounds. *Id*.; ETHAN HOFFMAN & JOHN MCCOY, CONCRETE MAMA: PRISON PROFILES FROM WALLA WALLA 4 (1981). Medical facilities were nonexistent and amputations performed with tools borrowed from the carpentry shop. GEORGE W. FRANCE, THE STRUGGLES FOR LIFE AND HOME IN THE NORTH-WEST 257 (1890) (providing a firsthand

12

No. 99344-1

account of confinement in Seatco).  One Seattle newspaper reported on the appalling

conditions, describing the treatment of prisoners as "a sort better adapted for the care of

animals than human beings."  *The Penitentiary*, SEATTLE WEEKLY CHRONICLE, Oct. 4,

1883, at 4.  The newspaper also observed that prisoners were not properly fed and were

"miserably clothed" and routinely punished.  *Id*.  Public outcry pressured the legislature

to institute reforms and, eventually, to authorize the building of a state-run prison in

Walla Walla.  *See id*.; KEVE, *supra*, at 54; HOFFMAN & MCCOY, *supra*, at 4.

This court considered the preceding history in interpreting article II, section 29.

*See Yarbrough*, 151 Wn.2d at 489-93.  From it, we concluded that Washington's

founders intended the provision, in part, "to protect inmates from the cruelty of the lease

system."  *Id*. at 485; *see also Wash. Water Jet Workers Ass'n v. Yarbrough*, 148 Wn.2d

403, 417, 61 P.3d 309 (2003) (noting the drafters of Washington's constitution opposed

the lease system and adopted article II, section 29 to address the "extensive reputation for

brutality, corruption, and ineffectiveness that the contract system of convict labor had in

the Washington Territory and throughout the country"), *aff'd in part and rev'd in part*,

151 Wn.2d 470.[4]  The drafters' decision to enshrine a prohibition on private contract

leasing in Washington's constitution demonstrates this state's long-standing interest in

providing some measure of protection against harsh conditions of confinement.

---

[4] In addition to protecting inmates from inhumane labor systems, Washington's constitutional
delegates intended article II, section 29 to protect free labor from having to compete with prison-
run programs.  *Wash. Water Jet Workers*, 151 Wn.2d at 485.

No. 99344-1

We have also noted that throughout its history, Washington's prison system has undergone "[m]any innovative programs" "to alleviate *improper conditions*." *Bresolin v. Morris*, 86 Wn.2d 241, 249, 543 P.2d 325 (1975) (emphasis added). In the 1970s, the Walla Walla penitentiary was one site for such "innovative" reforms, which included making inmate work optional, ceasing mail censorship, eliminating prisoner dress codes and grooming standards, and establishing an inmate-elected council with some say in governing the institution. HOFFMAN & MCCOY, *supra*, at 5; WILLIAM R. CONTE, IS PRISON REFORM POSSIBLE? THE WASHINGTON STATE EXPERIENCE IN THE SIXTIES 87 (1990). The *New York Times* commented on the Walla Walla prison "experiment" occurring in the early 1970s as "perhaps the strangest in the United States." CONTE, *supra*, at 107 (quoting Wallace Turner, *Self-Governing Inmates of Walla Walla Prison Find Life Easier*, N.Y. TIMES, Oct. 18, 1971, at 24). Though the Walla Walla experiment ended by 1979, *id*. at 125, it constituted a singular example of prison reform and changes to conditions of confinement. These reforms, combined with Washington's history of protecting convicted persons from the cruelty of prison labor pursuant to article II, section 29, demonstrate a specific interest in the conditions in which prisoners are confined. The third *Gunwall* factor therefore weighs in favor of a more protective interpretation of article I, section 14 in the present context.

The fourth *Gunwall* factor directs us to consider whether established bodies of state law, including statutory law, support more protective state constitutional rights. 106 Wn.2d at 61. As the State notes, Washington precedent on prison conditions is sparse.

14

No. 99344-1

An early decision from this court appears to interpret article I, section 14 as equivalent to the Eighth Amendment. *State v. Feilen*, 70 Wash. 65, 67, 126 P. 75 (1912).[5] But *Gunwall* clarifies that courts consider not just the particular constitutional provision but all statutory and case law related to the issue. 106 Wn.2d at 66; *Grant County Fire Prot. Dist. No. 5 v. City of Moses Lake*, 150 Wn.2d 791, 809, 83 P.3d 419 (2004). The question is then whether Washington law has been more protective than federal law in the context of prison conditions. The answer to that question is yes.

Washington has prohibited private prisons and detention centers in the state. LAWS OF 2021, ch. 30, § 3. In contrast, the Federal Bureau of Prisons has historically contracted with the private sector to operate and manage federal prisons. *See* Omnibus Consolidated Appropriations Act, 1997, Pub. L. No. 104-208, § 101(a), 110 Stat. 3009, 3009-11 (1996) (Congressional authorization for the Bureau of Prisons to contract with private companies to operate prisons).[6]

---

[5] *Feilen* upheld against an article I, section 14 challenge to a state law requiring sterilization for persons convicted of "'carnal abuse of a female person under the age of ten years, or of rape, or shall be adjudged to be an habitual criminal.'" 70 Wash. at 67 (quoting REM. & BAL. CODE § 2287). Forced sterilization of habitual criminals was appropriately condemned by the United States Supreme Court in *Skinner v. Oklahoma ex rel. Williamson*, 316 U.S. 535, 538, 62 S. Ct. 1110, 86 L. Ed. 1655 (1942). The *Skinner* Court reviewed Oklahoma's habitual criminal sterilization act that allowed sentences of compulsory sterilization for persons convicted of a certain number of crimes, yet exempted financial crimes. The Court unanimously held that the state law violated the Fourteenth Amendment equal protection clause based on the exclusion of white-collar crimes. *Id.* at 541 (holding that sterilization of criminals convicted multiple times of grand larceny but not those who commit embezzlement is "clear, pointed, unmistakable discrimination").

[6] For-profit incarceration has generated billions of dollars for private companies. *See, e.g.*, Danielle C. Jefferis, *Delegating Care, Evading Review: The Federal Tort Claims Act and Access to Medical Care in Federal Private Prisons*, 80 LA. L. REV. 37, 50 (2019) (private prison contractors such as GEO Group and CoreCivic reported collectively over $4 billion in revenue in 2017). On January 26, 2021, President Biden signed an executive order eliminating the use of

15

No. 99344-1

Additionally, case law recognizes Washington's long-standing and special duty to keep convicted individuals "in health and safety." *Kusah v. McCorkle*, 100 Wash. 318, 323, 170 P. 1023 (1918). *Kusah* explained that this duty requires officials to consider what is the "safest and most *humane* for the prisoners; what [is] most conducive to their health, well-being, and safety." 100 Wash. at 324 (emphasis added). As a matter of tort law, Washington courts have long recognized "a jailer's special relationship with inmates, particularly the duty to ensure health, welfare, and safety." *Gregoire v. City of Oak Harbor*, 170 Wn.2d 628, 635, 244 P.3d 924 (2010) (plurality opinion). Providing for the health of prisoners is a nondelegable duty for Washington's DOC. *Id*. (citing *Shea v. City of Spokane*, 17 Wn. App. 236, 242, 562 P.2d 264 (1977)). This heightened duty is derived from the special relationship between custodians and the individuals entrusted to their care. *See Turner v. Dep't of Soc. & Health Servs*., No. 99243-6, slip op. at 15 (Wash. Aug. 12, 2021), https://www.courts.wa.gov/opinions/pdf/992436.pdf. Inmates rely completely on DOC to make decisions as to their safety and health care, similar to students relying on schools, guests on innkeepers, and patients on hospitals. *See H.B.H. v. State*, 192 Wn.2d 154, 169, 429 P.3d 484 (2018). Not every jurisdiction undertakes this heightened duty to ensure the health of incarcerated individuals. *E.g.*, *Herbert v. District of Columbia*, 716 A.2d 196, 198-99, 201 (D.C. 1998) (stating it was not the government's duty to ensure inmates' safety or well-being); *Rivers v. State*, 159

---

privately operated criminal detention facilities by the federal government. Exec. Order No. 14,006, 86 Fed. Reg. 7483 (Jan. 26, 2021) (Reforming Our Incarceration System To Eliminate the Use of Privately Operated Criminal Detention Facilities).

No. 99344-1

A.D.2d 788, 789, 552 N.Y.S.2d 189 (1990) (the State is not the guarantor of adequate medical services beyond its control).

Finally, this court's disproportionate sentencing cases recognize punishments that were once constitutional "can become cruel under article I, section 14 if there is a material change in circumstances." Pet'r's Opening Br. in Supp. of PRP at 23 (Wash. Ct. App. No. 54629-9-II (2020)) (citing *Bassett*, 192 Wn.2d at 91 (holding Washington's cruel punishment clause prohibits life without parole sentences for juvenile offenders); *State v. Gregory*, 192 Wn.2d 1, 427 P.3d 621 (2018) (holding the death penalty unconstitutional as applied in Washington)). Though *Bassett* and *Gregory* concern disproportionate sentencing challenges, those cases recognize the general principle that scientific developments and changes in circumstances can render once-acceptable punishments unconstitutionally cruel. *See Bassett*, 192 Wn.2d at 81 (considering the evolution of juvenile sentencing in Washington); *Gregory*, 192 Wn.2d at 18-19 (examining statistical data that shows the arbitrary and racially biased administration of the death penalty in Washington). Both cases recognize the effect of immutable characteristics on disproportionate sentencing. In so doing, they illustrate an evolution in understanding of immutable characteristics such as physical and mental disability, and the need for accommodation. Preexisting state law weighs in favor of a broader interpretation of article I, section 14.

The fifth *Gunwall* factor reviews the structural differences between the state and federal constitutions. 106 Wn.2d at 62. The United States Constitution is a grant of

17

No. 99344-1

limited power authorizing the federal government to exercise only constitutionally enumerated powers delegated to it by the states, while Washington's constitution limits the plenary power of the State to act in any way not forbidden by the state constitution or federal law. *Id.* Accordingly, this factor "will always point toward pursuing an independent state constitutional analysis." *Young*, 123 Wn.2d at 180 (citing *State v. Smith*, 117 Wn.2d 263, 286, 814 P.2d 652 (1991) (Utter, J., concurring)).

The sixth *Gunwall* factor examines whether the matter is of particular state interest or local concern. 106 Wn.2d at 62. The conditions of state prison confinement qualify. Article XIII, section 1 of our state constitution provides that "penal institutions . . . shall be fostered and supported by the state, subject to such regulations as may be provided by law." This court has said that the provision allows significant discretion to the legislature in determining the method and extent of financial support to provide. *See Pierce County Office of Involuntary Commitment v. W. State Hosp.*, 97 Wn.2d 264, 271, 644 P.2d 131 (1982) (citing *State v. Pierce County*, 132 Wash. 155, 231 P. 801 (1925)). Not only is it the state's responsibility to financially support its prison systems, the "treatment or discipline of prisoners in penal institutions" is "the responsibility of those in charge of the prison itself and those officers, both state and local, who are given supervisory powers." *Woods v. Burton*, 8 Wn. App. 13, 16, 503 P.2d 1079 (1972). Accordingly, Washington prisons may not cause "the deprivation of human dignity by conditions primarily related to sanitation and hygiene which are so base, inhumane and barbaric they offend the

18

No. 99344-1

dignity of any human being." *Id*. at 16-17 (citing *Novak v. Beto*, 453 F.2d 661 (5th Cir. 1971); *Sostre v. McGinnis*, 442 F.2d 178 (2d Cir. 1971)).[7]

The State counters that when establishing Washington's correctional system, the legislature tied penal objectives to national standards. DOC's Suppl. Br. at 10 (quoting RCW 72.09.010(9)). This connection, according to the State, shows that Washington did not intend to diverge from the federal system for prison conditions. Yet the plain language of RCW 72.09.010(9) does not support such a reading. RCW 72.09.010(9) states that Washington's corrections "system *should* meet those national standards which the *state* determines to be appropriate." (Emphasis added.) The term "should" is permissive rather than mandatory; it does not require wholesale adoption of national standards. Further, because RCW 72.09.010(9) specifically allows the State to choose which standards it deems acceptable, logically it allows the reverse: adopting no national standard if found to be inappropriate. *See id*. The discretionary nature of RCW 72.09.010(9) undercuts the State's argument that Washington is in lockstep with federal correctional objectives. Instead, RCW 72.09.010(9) is an example of the more general

---

[7] We conclude that the unhygienic conditions of Williams's confinement rather than the risk of contracting COVID-19 constitute cruel punishment under article I, section 14. Nevertheless, COVID-19 continues to pose a serious concern to incarcerated individuals and to the general public. The response from state officials to this risk provides further evidence that the issue of prison conditions is a matter of state and local concern. For example, Governor Jay Inslee issued numerous proclamations, including one directed solely at prisons. Proclamation 20-50 allowed the governor to suspend some statutes standing in the way of early release of prisoners, commute certain sentences, and order the release of some nonviolent individuals. Proclamation of Governor Jay Inslee, No. 20-50 (Wash. Apr. 15, 2020), https://www.governor.wa.gov/sites/default/files/proclamations/20-50%20-%20COVID-19%20Reducing%20Prison%20Population.pdf [https://perma.cc/C5J8-7KQ2].

19

No. 99344-1

notion that the federal government sets a *minimum* standard for correctional institutions, which states can and do routinely go beyond. One example of this is Washington's ban on privately operated prisons and detention centers. *See supra* at 15.

The six *Gunwall* factors support a broader interpretation of article I, section 14 than the Eighth Amendment. We hold that in the context of prison conditions, which includes prisoners' health and welfare, Washington's cruel punishment clause provides greater protection than its federal counterpart. We now turn to the test petitioners must satisfy to prevail on claims that the conditions of their confinement are unconstitutionally cruel under article I, section 14.

II. <u>Under Washington's Constitution, Conditions of Confinement That Create a Substantial Risk of Serious Harm Are Unconstitutional Unless They Are Reasonably Necessary To Accomplish a Legitimate Penological Goal</u>

Both the Washington and United States constitutions prohibit cruel punishments. In the past, our courts have evaluated state and federal constitutional challenges to prison conditions under *Farmer v. Brennan*, 511 U.S. 825, 828, 114 S. Ct. 1970, 128 L. Ed. 2d 811 (1994), which requires a petitioner to show "a substantial risk of serious harm and deliberate indifference to that risk." *Colvin*, 195 Wn.2d at 900; *see also In re Pers. Restraint of Pauley*, 13 Wn. App. 2d 292, 310, 466 P.3d 245 (2020). Washington courts applied the federal deliberate indifference standard largely because the parties in those cases did not seek an independent state constitutional analysis. *See Colvin*, 195 Wn.2d at 900; *Pauley*, 13 Wn. App. 2d at 310. Here, by contrast, Williams argued, and we agree, that article I, section 14 is more protective than the Eighth Amendment in the area of

20

No. 99344-1

prison conditions. While we agree that the deliberate indifference standard provides a useful framework and applies to such claims, we also consider that standard in light of the broader protections that article I, section 14 provides. For the reasons explained below, we conclude that because Washington's cruel punishment clause is more protective of the health and safety of prisoners than its federal counterpart, the federal deliberate indifference standard is inadequate to address claims arising under article I, section 14. Instead we hold that to prevail on a PRP challenging conditions of confinement, a petitioner must demonstrate that (1) those conditions create an objectively significant risk of serious harm or otherwise deprive the petitioner of the basic necessities of human dignity and (2) those conditions are not reasonably necessary to accomplish any legitimate penological goal.

A.  The Federal Deliberate Indifference Standard

A prison official violates the Eighth Amendment and may be held liable "for denying humane conditions of confinement only if he knows that inmates face a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it." *Farmer*, 511 U.S. at 847. That standard has two components: one objective and one subjective. Under the objective component, a prisoner must show the challenged conditions create "an objectively intolerable risk of harm." *Id*. at 846. Such conditions include deprivations of "'the minimal civilized measure of life's necessities,'" such as "adequate food, clothing, shelter, and medical care." *Id*. at 834 (quoting *Rhodes v. Chapman*, 452 U.S. 337, 347, 101 S. Ct. 2392, 69 L. Ed. 2d 59 (1981)), 832.

21

No. 99344-1

The subjective component requires a prisoner to show those objectively cruel conditions of confinement are, in fact, meant to be punishment. *See id*. at 837. The federal standard therefore demands proof that a particular prison official acted with "deliberate indifference" to the risks identified under the objective prong. The subjective component requires that an official actually "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id*.

The federal standard, however, is just that. It guides the analysis of allegedly cruel conditions of confinement under the *federal* constitution. The present case concerns conditions of confinement challenged under the *Washington State* constitution. As the preceding *Gunwall* analysis demonstrates, article I, section 14 is more protective than the Eighth Amendment in this context. When bringing this fact to bear on the federal deliberate indifference test, two shortcomings emerge in the subjective component.

First, it mistakenly assumes that conditions of confinement can be considered punishment, and therefore subject to constitutional limitations, only if they are subjectively intended as punishment by an identifiable prison official. *See Wilson v. Seiter*, 501 U.S. 294, 300, 111 S. Ct. 2321, 115 L. Ed. 2d 271 (1991) ("If the pain inflicted [by a condition of confinement] is not formally meted out *as punishment* by the statute or the sentencing judge, some mental element must be attributed to the inflicting officer before it can qualify" as punishment subject to Eighth Amendment limitations.).

22

No. 99344-1

Second, it fails to recognize that cruel conditions of confinement can result from institutional policies and practices just as readily as from intentional acts by individual prison officials. *Id*. at 310 (White, J., concurring in judgment) ("Inhumane prison conditions often are the result of cumulative actions and inactions by numerous officials inside and outside a prison, sometimes over a long period of time. In those circumstances, it is far from clear whose intent should be examined . . . . In truth, intent simply is not very meaningful when considering a challenge to an institution, such as a prison system."). Together, these shortcomings allow conditions of confinement to persist—even if those conditions are unquestionably cruel—so long as the relevant prison official pleads ignorance or good intentions. *See Farmer*, 511 U.S. at 844 ("Because, however, prison officials who lacked knowledge of a risk cannot be said to have inflicted punishment, it remains open to the officials to [avoid liability by] prov[ing] that they were unaware even of an obvious risk to inmate health or safety . . . or that they knew the underlying facts but believed (albeit unsoundly) that the risk to which the facts gave rise was insubstantial or nonexistent.").

The different mechanisms for seeking relief from federal or state unconstitutional conditions of confinement further highlight the shortcomings of the subjective component. Federal cases challenging prison conditions under the Eighth Amendment are frequently brought via 42 U.S.C. § 1983 or *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388, 91 S. Ct. 1999, 29 L. Ed. 2d 619 (1971), and seek damages from individual government officials who deprived prisoners of their

23

No. 99344-1

federal constitutional rights. *See, e.g.*, *Farmer*, 511 U.S. 825. But challenges to conditions of confinement under article I, section 14 of Washington's constitution generally arise as PRPs, seeking injunctive relief ordering prisons to remedy any unconstitutional conditions. PRPs do not attach personal liability for monetary damages for deprivations of constitutional rights; rather, they seek an institutional change to remedy an unconstitutional action or condition. This focus on the institution rather than the prison official's intent further supports our conclusion that Washington's constitution provides greater protection than is offered under the subjective component of the federal standard.

Under article I, section 14, whether a condition of confinement is cruel does not depend on the subjective knowledge or intent of particular prison officials. Instead, the text and history of Washington law recognizes that the State has a nondelegable obligation to provide for the health, safety, and well-being of prisoners under its jurisdiction. "This is a positive duty arising out of the special relationship that results when a custodian has complete control over a prisoner deprived of liberty." *Shea*, 17 Wn. App. at 242. Washington prisons may not cause "the deprivation of human dignity by conditions . . . which are so base, inhumane and barbaric they offend the dignity of any human being," whether intentionally or accidentally. *Woods*, 8 Wn. App. at 16-17 (citing *Novak*, 453 F.2d 661; *Sostre*, 442 F.2d 178). In either case, DOC has an obligation to remedy those unconstitutionally cruel conditions of confinement. The special relationship between DOC and those confined in its institutions has consequences

24

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

No. 99344-1

for our formulation of a test to analyze claims of unconstitutional cruel prison conditions and further supports providing greater protection than the subjective component of the federal deliberate indifference standard.

B.  Unconstitutionally Cruel Conditions of Confinement Claims under Article I, Section 14

Today, we recognize that conditions of confinement are inherently part of the punishment imposed on prisoners.  But for their conviction and sentence, prisoners would not be confined or subject to the attendant conditions of confinement.  We also recognize that unconstitutionally cruel conditions of confinement can arise from institutional policies and practices just as readily as from the malicious actions of individual prison officials.  Whether prison conditions deprive prisoners of basic human dignity intentionally or incidentally, Washington's constitution prohibits such treatment.

Furthermore, the drawbacks of the federal standard's subjective component when viewed in conjunction with Washington case law convince us that the federal deliberate indifference standard does not adequately protect prisoner rights under our state constitution.  *See Bassett*, 192 Wn.2d at 85 (this court is "free to evolve our state constitutional framework as novel issues arise to ensure the most appropriate factors are considered").  At the same time, we recognize the practical challenges facing prison administrators and acknowledge that some harsh conditions of confinement that might otherwise be cruel may sometimes be justified by legitimate penological interests, including the health and safety of the prison population as a whole.  Nevertheless, when such harsh conditions create an objectively intolerable risk of harm, they can survive

25

No. 99344-1

constitutional scrutiny under article I, section 14 only when they are reasonably necessary to accomplish legitimate penological goals.

The relationship between punishment and the reason for that punishment has been a consistent and important consideration in this court's article I, section 14 jurisprudence. In the context of sentencing, that consideration has focused on whether the sentence imposed is proportionate to the crime. *See Fain*, 94 Wn.2d at 401 ("Fain's offenses, if not indeed trivial when compared to his punishment, have earned him a penalty much in excess of that imposed for those crimes which society ordinarily regards as far more serious threats to life, health, and property."); *Bassett*, 192 Wn.2d at 90 (striking as unconstitutional a statute allowing juvenile offenders to be sentenced to life without parole because of "the unacceptable risk that children undeserving of a life without parole sentence will receive one"). Because conditions of confinement are largely independent of the formal sentence imposed by a court, it makes little sense to ask whether those conditions are proportionate to the crime being punished. Instead, the relevant question is whether conditions of confinement are proportionate to legitimate penological interests to be achieved. We hold that when a prisoner establishes that the conditions of their confinement create an objectively intolerable risk of harm or otherwise deprive them of the basic necessities of human dignity, those conditions can be justified only when they are reasonably necessary to accomplish legitimate penological goals.[8]

---

[8] Some conditions of confinement may be so unquestionably cruel that no penological interest could justify them. Other conditions may become cruel when they are imposed without any legitimate penological interest. We leave these questions for another day because they are not necessary to resolve the case before us.

No. 99344-1

In sum, article I, section 14 of Washington's constitution prohibits the State from imposing cruel conditions of confinement on prisoners. Whether conditions of confinement are cruel does not depend on the subjective intent of individual actors within the prison system but on the proportionality of those conditions to legitimate penological justifications. To prevail on a PRP challenging conditions of confinement, a petitioner must demonstrate that (1) those conditions create an objectively significant risk of serious harm or otherwise deprive them of the basic necessities of human dignity and (2) those conditions are not reasonably necessary to accomplish any legitimate penological goal.

As to the first prong, we conclude the conditions of Williams's confinement exposed him to a significant risk of serious harm by depriving him basic hygienic necessities. Williams was required to use a wheelchair and had minimal use of one side of his body. As a result, Williams depended on others to push his wheelchair in order to move. He was confined to a dry cell without a sink and toilet, and Williams shared this cell with multiple roommates. The lack of access to bathroom facilities and running water, as well as routine and lengthy wait times for therapy aides to push his wheelchair resulted in Williams frequently soiling himself. These conditions are objectively cruel.

Turning to the second prong, we conclude that these conditions were not reasonably necessary to achieve any legitimate penological goal. DOC contends the violent nature of Williams's offense and his continued risk to the community generally relate to the penological goals of retribution, deterrence, incapacitation, and rehabilitation. These considerations are lessened by Williams's advanced age (as of

27

No. 99344-1

2020, he was 78 years old) and limited sight and mobility, but we agree with the Court of Appeals and defer to DOC's determination that Williams was not sufficiently incapacitated to pose a low risk to community safety. *Williams*, 15 Wn. App. 2d at 681-82. Williams's violent offense and risk to the community weigh in favor of continuing to confine him in DOC custody. They do not, however, justify housing Williams in severely unhygienic conditions. DOC's failure to meet Williams's basic sanitary needs in light of his physical disabilities does not sufficiently further the goals of deterrence, incapacitation, and rehabilitation.

Therefore, we conclude that the conditions of Williams's confinement violated our state's cruel punishment clause. We acknowledge the challenges faced by prison administrators, especially during the COVID-19 pandemic, and we recognize that DOC has taken significant steps to mitigate the associated risks. Nevertheless, because DOC deprived Williams of basic hygiene and such conditions were not necessary to accomplish a legitimate penological interest, we hold Williams's conditions of confinement violated article I, section 14's prohibition on cruel punishment.

CONCLUSION

We hold that article I, section 14 is more protective than the Eighth Amendment for conditions of confinement. To analyze claims of unconstitutionally cruel prison conditions, we adopt a modified version of the federal deliberate indifference standard. An individual challenging his or her conditions of confinement must demonstrate two things: (1) the conditions create an objectively significant risk of serious harm or

28

No. 99344-1

otherwise deprive a person of the basic necessities of human dignity and (2) the conditions are not reasonably necessary to accomplish a legitimate penological goal. For the reasons explained above, Williams satisfies this test, and we hold his conditions of confinement were unconstitutionally cruel.

_____
Madsen, J.

WE CONCUR:

_____        _____
González, C.J.                          Gordon McCloud, J.

_____        _____
Johnson, J.                             Yu, J.

_____        _____
Owens, J.                               Montoya-Lewis, J.

_____        _____
Stephens, J.                            Whitener, J.

29